**Opinion issued August 13, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00502-CV

————————————

**KELLY R. GINN, GREEN-SPAN PROFILES, L.P., GREEN-SPAN MANAGEMENT, L.L.C., GREEN-SPAN ENTERPRISES, INC., AND BKG INVESTMENTS, L.L.C., Appellants/Cross-Appellees**

**V.**

**NCI BUILDING SYSTEMS, INC., Appellee/Cross-Appellant**

---

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-35831**

---

# O P I N I O N

Appellants/cross-appellees, Kelly R. Ginn, Green-Span Profiles, L.P.,

Green-Span Management, L.L.C., Green-Span Enterprises, Inc., and BKG

Investments, L.L.C. (collectively, "Ginn"), challenge the trial court's judgment, entered after a jury trial, awarding appellee/cross-appellant, NCI Building Systems, Inc. ("NCI"), damages in NCI's suit against Ginn for fraud, breach of fiduciary duty, and unjust enrichment. In thirteen issues, Ginn contends that insufficient evidence supports the jury's findings in favor of NCI on its claims for fraud, breach of fiduciary duty, and unjust enrichment and the trial court erred in charging the jury, disregarding the jury's finding of zero damages on NCI's stock claim, not disregarding the jury's finding that he "did not prove that h[is] [employment] was terminated for cause," granting rescission of the parties' contract, awarding NCI restitution damages, and not awarding him his attorney's fees.

In its cross-appeal, NCI, in two issues, contends that the trial court erred in not awarding it attorney's fees and granting Ginn partial summary judgment on its breach-of-contract claims.

We affirm.

## Background

In its fifth amended petition, NCI, "a publicly-traded company . . . headquartered in Houston, Texas," alleged that "[i]t designs, manufactures, markets, and sells metal building systems and components[, including insulated metal panels,] that are used in the construction of

2

metal buildings." Ginn worked for NCI for "over 20 years," serving in the later years of his employment as its executive vice president of operations. "In this role, Ginn, among other things, was closely involved in NCI's development of new business [and marketing] strategies to expand its insulated metal panel products lines," and he was "tasked with locating and purchasing new equipment that would allow NCI to make insulated metal panels faster and with less labor." By virtue of his position, Ginn received NCI's confidential and proprietary information, including "sales information, pricing data, . . . financial records, . . . [and] customer lists."

During Ginn's employment with NCI, it "periodically awarded [him] unvested restricted stock," and the Restricted Stock Agreements, signed by Ginn in conjunction with the awards, contained non-competition, non-solicitation, and non-disclosure provisions. According to NCI, when Ginn accepted the unvested restricted stock, "he agreed he would not, for five years, engage in a competing business within 250 miles of NCI's manufacturing facilities[,] . . . solicit NCI's employees[,] . . . [or] call upon or solicit NCI's customers or vendors." He also agreed to not disclose or use any of NCI's "confidential" or "proprietary" information" or "trade secrets."

On March 27, 2008, Ginn resigned from NCI, effective March 31, 2008, and he and NCI negotiated and entered into a "Separation Agreement." NCI agreed to

3

"retain Ginn as a consultant for one year," from March 31, 2008 through March 31, 2009, and continue to pay him his normal salary, plus medical benefits. In return, Ginn agreed to "five-year non-compete and non-solicitation agreements" and a non-disclosure agreement. And, "[a]s consideration for the Separation Agreement," NCI "agreed to give Ginn immediate vesting of all of his [unvested] restricted stock," which was valued at $1,582,167.

NCI further alleged that Ginn, prior to signing the Separation Agreement, and without NCI's knowledge, "accessed and copied a large amount of highly confidential [company] information" to an external hard drive. "The information downloaded by Ginn would [have] be[en] valuable [to] a competitor of NCI," and Ginn "had no reason to copy this information, unless he intended, from the outset[,] to violate the terms of [the] Separation Agreement."

NCI also alleged that during the time that Ginn served as a consultant, he developed a business plan for "a new competing business" and created several business entities, including Green-Span Profiles, L.P., Green-Span Management, L.L.C., Green Span Enterprises, Inc., and BKG Investments, L.L.C. (collectively, "Green-Span"). Ginn created Green-Span "to manufacture, market, and sell insulated metal panels," and as asserted by NCI, he solicited NCI employees, customers, and vendors, "us[ing] and disclos[ing] NCI's confidential information" that he had retained following his resignation.

4

NCI brought claims against Ginn for breach of contract, fraud, breach of fiduciary duty, and unjust enrichment,[1] seeking damages, injunctive relief, and attorney's fees.[2]  Ginn counterclaimed, seeking attorney's fees[3] and alleging that NCI "knew at the time that [the Separation Agreement] was executed that it did not contain limitations as to time, geographical area and scope of activity that were reasonable, and the limitations in th[e] [Separation] Agreement imposed a greater restraint than necessary to protect the goodwill or other business interest of [NCI]."[4]

***Temporary Injunction***

NCI filed an application for temporary injunction, seeking to enjoin Ginn from competing with NCI, soliciting NCI customers and employees, and using NCI's confidential information.  On September 15, 2009, the trial court denied NCI's application to the extent that it sought enforcement of the Separation Agreement's non-competition provision.  But, it granted NCI's request for a temporary injunction to the extent that it sought to enjoin Ginn from soliciting NCI employees and one of NCI's vendors, PUMA.  The trial court also enjoined Ginn from using or disclosing any of NCI's confidential information.

---

[1]     NCI brought other claims against Ginn, but they are not relevant to this appeal.

[2]     *See* TEX. BUS. & COM. CODE ANN. § 27.01(e) (Vernon 2015).

[3]     *See* TEX. BUS. & COM. CODE ANN. § 15.51(c) (Vernon 2011).

[4]     *See id.* § 15.51.

5

### *Summary Judgment Motion*

Prior to trial, Ginn sought summary judgment on several of NCI's claims. In regard to NCI's breach-of-contract claims, Ginn argued that the non-competition and non-solicitation provisions in the Separation Agreement were unenforceable as a matter of law because NCI did not provide him consideration in the form of new confidential information or trade secrets after its execution. He asserted that the financial incentives that NCI provided to him, pursuant to the Separation Agreement, did not constitute valid consideration for the non-competition and non-solicitation provisions. Ginn further argued that the non-competition and non-solicitation provisions were unenforceable because they were "[o]verbroad in the scope of activities they s[ought] to restrain[,] . . . [u]nreasonable in duration[,] . . . [and] [u]nreasonable in the geographic scope they s[ought] to cover." He also argued that because NCI was seeking to enforce provisions of the Separation Agreement, which were unenforceable, NCI was unable to recover the attorney's fees that it incurred in pursuing enforcement.[5]

The trial court partially granted Ginn summary judgment, concluding that the non-competition provision and the non-solicitation provision, to the extent that it prohibited the solicitation of NCI customers, were "unenforceable for lack of consideration." Accordingly, the trial court dismissed NCI's breach-of-contract

---

[5]   *See id.* § 15.51(c) (allowing only employee to recover attorney's fees in limited circumstances).

claims, including its claim for injunctive relief, to the extent that they were based on Ginn's alleged breaches of the Separation Agreement's non-competition provision and non-solicitation provision, as far as it related to NCI customers. Following the trial court's ruling, NCI nonsuited its remaining breach-of-contract claims.

*Trial*

At trial, Ginn testified that in 1985, he began working full-time for Metal Building Components, Inc. ("MBCI"), a company co-founded by his father, A.R. Ginn. MBCI manufactured and supplied components used in the construction of metal buildings, and A.R. Ginn served as the company's president. In 1998, MBCI merged with NCI, and the new company retained the name NCI. Following the merger, Ginn remained in his previously held position of vice president of manufacturing until 2000, when he was promoted to president of the metal components division. In 2003, A.R. Ginn became the chief executive officer ("CEO") of NCI, and Norm Chambers was hired to serve as NCI's president and chief operating officer ("COO").

When A.R. Ginn retired in 2007, Chambers became president and CEO of NCI, and he continued to handle his responsibilities as COO. During this time, per Chambers' request, Ginn left his position as president of the metal components division "to come over to the corporate office" and work with Chambers. Ginn

7

assumed a new position, executive vice president of operations, and became "active in the insulated panels portion of the company's business." At this time, Chambers was considering Ginn, along with others, for the position of COO.

On March 14, 2008, Ginn met with Chambers, who informed him that he had decided to promote Mark Dobbins to COO of NCI and "eliminate[]" Ginn's "position of executive vice-president." Chambers explained that "he had looked around the company and couldn't find a place" for Ginn. He noted that "it would be in [Ginn's] best interest to resign" and NCI would "make [his] stock vest immediately" and "enter into a consulting agreement" with Ginn "for some period of time up to a year." Chambers also noted that NCI would hire "a[n] outplacement firm . . . to help . . . [Ginn] find a new job."

Ginn did not argue with Chambers about his decision to promote Dobbins, but he was "very surprised." "[I]t was clear" to Ginn that he had "no options" and "didn't have a choice but to leave [NCI]." However, he did not want to resign from NCI, and he did not "voluntarily resign"; rather, according to Ginn, Chambers "terminated [his employment] without cause" during the March 14, 2008 meeting.

On March 27, 2008, NCI and Ginn entered into the Separation Agreement, in which Ginn stated that he "desire[d] to resign as an executive officer of the

8

Company . . . including the position of Executive Vice President—Operations."

The Separation Agreement provides, in pertinent part,

1.  Resignation from Officer/Director Positions. Ginn agrees to remain employed in his current position in a full-time capacity through the dates specified herein. Effective as of March 31, 2008, Ginn agrees to and hereby resigns each of his officer positions with the Company and . . . each of his director positions . . . . Ginn shall remain employed in his positions as Executive Vice President—Operations through the Transition Date, and shall resign from such position on that date. "Transition Date," as used herein, shall mean March 31, 2008.

2.  Separation from Employment. Following the Transition Date, Ginn hereby agrees to be engaged as a consultant on behalf of the Company during the Advisory Period (as defined below) on an as-needed basis. Ginn agrees to perform such limited services as shall be requested by the Company and agreed to by Ginn at such times and rates as are mutually agreeable to Ginn and the Company; *provided, however*, that Ginn shall not be obligated to perform such services to the extent such services would interfere with his pursuit of other personal and/or business interests that are not Inconsistent with the terms of this Agreement, and provided, further, that Ginn will work no more than twenty (20) hours per month in his consulting capacity on behalf of the Company. . . . Services required of him may Include, but are not limited to, the following:

    a.  . . . [S]ervices as are reasonably necessary to assist the Company In a transition of his responsibilities as an officer of the Company. . . ;

    b.  Respond to . . . any questions posed by or on behalf of the Company regarding any litigation in which the Company . . . is then or may become involved; and

    c.  Perform such other consulting services for the Company . . . as shall be reasonably requested by the Chief

9

Executive Officer . . . and that are not materially different from his prior duties and responsibilities . . . .

The "Advisory Period" shall be the period from the Transition Date through March 31, 2009 (the "Termination Date"). Unless earlier terminated pursuant to this Agreement, Ginn's consulting relationship with the Company shall terminate as of the Termination Date.

3. Salary and Benefits. . . . Ginn shall be entitled to consideration set forth below during the period beginning on the Effective Date [March 27, 2008] and ending on the Termination Date.

   a. Salary Prior to the Transition Date. From the Effective Date through the Transition Date, Ginn shall continue to receive his base salary . . . .

   b. Compensation during the Advisory Period. From March 31, 2008 through March 31, 2009, [Ginn] shall continue to receive his base salary . . . .

   . . . .

   d. Restricted Stock. . . . All Restricted Stock Awards granted to Ginn prior to December 31, 2007 will fully vest as of March 30, 2008.[6]

---

[6] While working at NCI, Ginn signed a series of Restricted Stock Agreements, which awarded him unvested restricted stock in the company. Each Restricted Stock Agreement contained non-competition, non-solicitation, and non-disclosure provisions similar to those found in the Separation Agreement. In 2003, Ginn received the majority of his stock, 54,526 shares, which, under the 2003 Restricted Stock Agreement, would vest when Ginn reached sixty-five years of age, assuming he remained an NCI employee until that time. The Restricted Stock Agreements were amended several times and subsequently provided that Ginn's stock would vest at 4.35 percent each year. And if NCI terminated Ginn's employment without cause, or if Ginn resigned "with Good Reason," the remaining unvested stock would vest immediately. However, if Ginn voluntarily resigned from NCI, or his employment was terminated "for Cause," he would forfeit his unvested stock. At the time that Ginn left NCI, the gross value of his unvested restricted stock was $1,582,840.

. . . .

f.  Welfare Benefits. From the Effective Date through the Transition Date, Ginn shall remain eligible to participate in the group health and medical benefit programs . . . . From the Transition Date through the Termination Date, Ginn . . . shall remain eligible to participate In the group health and medical benefit programs . . . .

. . . .

4.  Restrictive Covenants. As a material inducement to the Company to enter into this Agreement, Ginn agrees to the restrictive covenants set forth below:

a.  Non-Competition. During the Advisory Period and for the period ending five (5) years following the Termination Date, Ginn shall not, directly or indirectly and whether on his own behalf or on behalf of any other person, partnership, association, corporation or other entity, engage in or be an owner, director, officer, employee, agent, consultant or other representative of or for, or lend money or equipment to or otherwise support, any business that manufactures, engineers, markets, sells or provides, within a 250-mile radius of any then existing manufacturing facility of the Company and its subsidiaries and affiliates, metal building systems or components . . . , coated or painted steel or metal coils, coil coating or coil painting services, or any other products or services that are the same as or similar to those manufactured, engineered, marketed, sold or provided by the Company or its subsidiaries and affiliates prior to the Termination Date. . . . .

b.  Non-Solicitation. During the Advisory Period and for the period ending five (5) years following the Termination Date, Ginn shall not, directly or indirectly and whether on his own behalf or on behalf of any other person,

11

partnership, association, corporation or other entity, either (i) hire, seek to hire or solicit the employment or service of any employee, agent or consultant of the Company or its Subsidiaries and affiliates in a commercial capacity; (ii) in any manner attempt to Influence or Induce any employee, agent or consultant of the Company or its Subsidiaries and affiliates to leave the employment or service of the Company or its Subsidiaries or affiliates; (iii) use or disclose to any person, partnership, association, corporation or other entity any information concerning the names and addresses of any employees, agents or consultants of the Company or its Subsidiaries and affiliates unless such use or disclosure Is of a personal nature, Is requested by the Company or Is required by due process of law; or (iv) call upon, solicit, divert or attempt to call upon, solicit or divert the business of any customer, vendor or acquisition prospect of the Company or any of its Subsidiaries or affiliates with whom the Company dealt, directly or indirectly, during his engagement with the Company or its Subsidiaries or affiliates. . . . .

c. Confidential Information. For purposes of the covenants made in this Section 4, the Company promises to provide Ginn (as is necessary for Ginn's position) with various trade secrets and proprietary and confidential Information consisting of, but not limited to, business and/or strategic plans, budgets, fiscal plans, processes, computer programs, compilations of information, records, sales procedures, customer requirements, pricing techniques, customer lists, methods of doing business and other confidential Information (collectively referred to as the "Trade Secrets"), which are owned by the Company and regularly used in the operation of its business, but in connection with which the Company takes precautions to prevent dissemination to persons other than certain directors, officers and employees. . . . Ginn acknowledges and agrees that the Trade Secrets (i) are secret and not known in the industry or to the public; (ii) are entrusted to him after being informed of their

12

confidential and secret status by the Company and because of the fiduciary position occupied by him with the Company; (iii) have been developed by the Company for, and on behalf of, the Company through substantial expenditures of time, effort and money and are used in its business; (iv) give the Company an advantage over competitors who do not know or use the Trade Secrets; (v) are of such value and nature as to make it reasonable and necessary to protect and preserve the confidentiality and secrecy of the Trade Secrets; and (vi) the Trade Secrets are valuable, special and unique assets of the Company, the disclosure of which could cause substantial injury and loss of profits and goodwill to the Company. Ginn shall not use in any way or disclose any of the Trade Secrets, directly or indirectly, during the Advisory Period, or at any time thereafter, except as required in the course of his employment with the Company. . . . All files, records, documents, Information, data and similar items relating to the business of the Company, whether prepared by Ginn or otherwise coming into his possession, shall remain the exclusive property of the Company and shall not be removed from the premises of the Company under any circumstances . . . , and In any event shall be promptly delivered to the Company upon termination of Ginn's employment for any reason; *provided however*, that Ginn may purchase his laptop from the Company . . . . Prior to such transfer of ownership, the Company shall ensure that all Confidential Information has been deleted from the laptop. Following a review of the laptop by the Company's IT personnel to ensure that it does not contain any Company Confidential Information, the Company will provide Ginn a copy of his contacts from the laptop and certain other personal information. . . . .

Ginn explained that although he intended to abide by the Separation Agreement when he signed it, he considered it to be "unreasonable." Nevertheless, he did not "make any fraudulent or false representation[s] or statement[s] to NCI"

13

when he executed the agreement. And he disputed that he had "resigned" from NCI, even though he signed the Separation Agreement which expressly states that he "desire[d] to resign as an executive officer of [NCI]."

Ginn further noted that, despite the language in the Separation Agreement regarding confidential information, he was not aware that he was required "to turn in all the files and documents and computer printouts and everything of the company['s] that [he] had." He also "didn't know" that he could not keep NCI information and property when he left the company. However, Ginn knew that, under the terms of the Separation Agreement, he "was not to disclose [NCI's] confidential information" and was not to solicit NCI employees, customers, and vendors. Looking back, Ginn realized that he was not "authorized" to have any NCI documents after leaving the company, and it was "wrong" of him to retain such information.

Ginn further testified that, while working at NCI, he maintained two laptops—his work computer and his home computer (the "Rice laptop"). In 2005, NCI "connected," or synchronized, his work computer with the Rice laptop. And NCI "installed a backup device," a "Seagate [external] hard drive," on the Rice laptop so that it would "backup every night." Eventually, however, the Seagate hard drive began "sending error message[s] saying backup [had] failed." Ginn,

therefore, independently, purchased a second external hard drive (the "Buffalo hard drive") in order to continue backing up his files on the Rice laptop.

Ginn purchased the Buffalo hard drive after his March 14, 2008 meeting with Chambers and "immediately before" signing the Separation Agreement. On the evening of March 26, 2008 and "the early morning hours" of March 27, 2008, the night before he signed the Separation Agreement, Ginn copied onto the Buffalo hard drive "all of NCI's materials," including confidential information, that were on the Rice laptop. It took approximately six hours for Ginn to download the information, which, Ginn admitted, was "confidential and proprietary to NCI," "valuable" to NCI, and the "property of NCI."[7] Because he purchased the Buffalo hard drive independently, NCI had "no way of knowing" of its existence. Following his backup of NCI's information on the Rice laptop and signing of the Separation Agreement, Ginn "deleted everything that [he] could identify that had NCI on it" from the Rice laptop. However, he kept all of the NCI materials that he had downloaded onto the Buffalo hard drive.

In regard to his work computer, Ginn, after signing the Separation Agreement, met with Quintin Prior, an employee in NCI's IT Department.

---

[7] Also, during this same time period, Ginn attached several thumb drives to the Rice laptop, but he could not recall his reason for doing so. He testified that he did not "transfer any . . . NCI documents from the Rice [laptop] . . . onto the thumb drives," but "may have" "delete[d] NCI information while the thumb drives were attached" to the Rice laptop. Ginn did not disclose to NCI the existence of the thumb drives at the time he signed the Separation Agreement.

15

Because NCI had agreed to allow Ginn to purchase his work computer when he left NCI, Prior extracted Ginn's personal files from the work computer and proceeded to "scrub[]" it to ensure the removal of all NCI information. Despite the fact that NCI had removed all of its information from Ginn's work computer, neither Prior, nor anyone else at NCI, asked him about any NCI documents on the Rice laptop or whether he had "any other NCI documents." Ginn admitted that he did not reveal to anyone that he had backed up NCI documents to the Buffalo hard drive. However, he explained that Prior, at the time, "would have been aware of the fact that [he] had the Rice laptop" and it "was synchronized with [his] [work] computer so that whatever was on [his work] computer w[ould] also [have been] on the Rice laptop."[8]

Ginn further testified that in December 2008, while being paid as a consultant for NCI, he created his first business plan for a company, located in Houston, Texas, that would "manufacture, market and sell insulated panels . . . for use in building construction."[9] NCI, however, had no knowledge that he was "developing a business plan to compete with [it]." Notably, the plan listed, as employees of and "people that were going to be involved" with Ginn's company,

---

[8] Ginn also explained that "[a]bout a week or ten days after [he] left NCI," he purchased another computer (the "Acer computer"), and "at some point," he plugged the Buffalo hard drive into the Acer computer. However, Ginn did not transfer NCI documents from the Buffalo hard drive to the Acer computer.

[9] This plan was updated in January 2009, as well as on several other occasions.

individuals who were employees of NCI at the time. The plan also specifically listed NCI as a competitor. Ginn marketed his business plan to investors, including customers and competitors of NCI, beginning in January 2009.[10]

Ginn noted that there are "similarities" between his business plan and information on the documents that he had retained from NCI. Also, his plan contains some of the "same" or "identical" language found in his retained NCI documents. Ginn explained, nevertheless, that he did not "cop[y] NCI information to make [his] business plan," nor was the language found in his business plan "taken from . . . NCI document[s]."

Finally, Ginn testified that in February 2009, he formed and registered his company, Green-Span. According to Ginn, NCI does not currently manufacture insulated metal panels within 250 miles of Ginn's Waller, Texas facility. However, NCI's insulated metal panels project was located in Stafford, Texas when Ginn was developing his business plan.[11]

In May 2009, Ginn began selling insulated metal panels. He repeatedly insisted that he was not "competing" with NCI by developing Green-Span, but was simply "preparing to compete." However, Ginn also admitted that "build[ing] a

---

[10]   In fact, one of NCI's major competitors is a current "partner in [Ginn's] business."

[11]   Stafford, Texas is within 250 miles of Waller, Texas. *See Latham v. Thornton*, 806 S.W.2d 347, 350 (Tex. App.—Fort Worth 1991, no writ) (taking judicial notice Travis County more than one hundred miles from Wichita County).

company that is going to sell and market insulated panels . . . would have been going into competition with [NCI]" and, by May 2009, he was "competing with NCI." Ginn currently employs four former NCI employees.

Norm Chambers, chairman, CEO, and president of NCI, testified that he initially joined NCI as president and COO, and in January 2007, he became CEO after A.R. Ginn retired. After his promotion, Chambers, tasked with filling the COO position, considered Ginn, Dobbins, and Brad Robinson for the role. At that time, Chambers also asked Ginn "to come join [him] at the corporate office," where Ginn assumed an executive vice president position.

In his new role, Ginn "dedicated a lot of his time" to NCI's new insulated metal panel business, and he was "leading th[e] charge in terms of . . . leading the development of the strategy . . . [to] put [NCI] in[to] th[e] [insulated metal panels] business." Ginn "traveled around the world," "looked at manufacturers, studied the market," and made presentations to NCI's board of directors. And, "with [a] small team of folks[,]" he developed "the whole strategy about how to manufacture [the product], what profiles, what the product should look like, the technology [NCI] should use, what chemistry [NCI] should use, [and] how [NCI] should go to market."

In March 2008, Chambers decided to promote Dobbins, rather than Ginn, to the COO position at NCI, and on March 14, 2008, Chambers met with Ginn to

inform him of that decision. After Chambers told Ginn that "Dobbins was the best choice for the company," Ginn "was very quiet for a fairly long period of time." Ginn then expressed that "he [had] felt he was going to be with the company for his lifetime, that he would . . . run the company like his father did at some point and . . . now that wasn't going to be the case." Ginn then told Chambers, "I've got to get out of here," which Chambers initially interpreted to mean that Ginn wanted to "leave [his] office." However, when Ginn made the same statement again, Chambers "realize[d]" that he actually "wanted to leave the company."

Chambers further testified, contrary to Ginn's testimony, that during their March 14, 2008 meeting, he "absolutely" did not tell Ginn that his employment would be terminated or he was "fired"; nor did Chambers state that he "had looked around and there was not another position" for Ginn at NCI. And Chambers did not discuss Ginn's company stock or its vesting. It was not Chambers' intention "for [Ginn] . . . to leave the company," and Ginn's employment "wasn't [being] terminated[,] [h]e just wasn't going to get the promotion." In fact, Chambers had even "given some thought to a possible other position for [Ginn]" because "he wasn't going to get the [COO] promotion."

A few days after the March 14, 2008 meeting, Ginn telephoned and "confirmed" that "he wanted to resign" from NCI, and he "asked what kind of [separation] package" would he receive. At that point, "it was absolutely clear [to

Chambers that Ginn] had decided he was going to leave the company." Chambers, however, never asked Ginn to say that he had resigned from NCI.

In regard to NCI's confidential information, Chambers explained that he was not aware that any NCI information was on the Rice laptop, the Rice laptop had been connected to Ginn's work computer, or Ginn had copied NCI documents, including NCI's customer list, to an external hard drive prior to leaving NCI. Notably, had Chambers known that Ginn had copied and retained NCI information prior to signing the Separation Agreement, Chambers would not have entered into the agreement with Ginn. And if Chambers had known that Ginn did not intend to abide by the terms of the Separation Agreement, or would go into competition with NCI, he also would not have signed the agreement.

Mark Dobbins, NCI's COO, testified that NCI decided to expand its insulated metal panels business in 2006, and in late 2006 or early 2007, Ginn joined other NCI employees in working on that aspect of NCI's business. Specifically, Ginn "was charged with leading the group to investigate the type of equipment that would be used [in NCI's insulated metal panels business], the type of processes to be used[,] and the location [of the business]." Prior to Ginn's departure from NCI, it "had made . . . decisions on the equipment manufacturers," "had an equipment purchase order signed and sent to Puma manufacturing[, one of NCI's vendors,]" "had decided on the location[,] and had contracted with a

20

contractor to start some initial plans for the site [where the business would be located]."

In regard to Ginn's departure, Dobbins testified that he believed that Ginn had resigned from NCI. After Chambers and Ginn's March 14, 2008 meeting, Dobbins met with Ginn "to transition the things that [Ginn] was working on" to prepare for his departure. During that meeting, in regard to the topic of his "leaving the company," Ginn told Dobbins, "This is all on me." Dobbins interpreted this statement as Ginn "letting [him] know that [he] shouldn't feel bad about [Ginn's departure]."

Dobbins also explained that, during their meeting, Ginn did not tell him that his employment had been terminated, and Ginn did not say anything in Dobbins' presence that was inconsistent with Ginn having resigned. According to Dobbins, when an individual's employment is terminated, NCI "immediately restrict[s] [his] access to [the] IT systems," and the employee has a "quick departure from the company." However, in Ginn's situation, his access to company files was not restricted, and he continued working after his March 14, 2008 meeting with Chambers.

Dobbins further testified that Ginn, when he left NCI, had to "have known that he couldn't . . . take[] [NCI] documents with him" and "it was a violation of company policy to download or copy all of the company's files on to an

21

independent hard drive." Dobbins explained that he did not know that Ginn had "cop[ied] NCI documents" or had "electronic possession" of NCI data until shortly before trial. NCI would not have "allowed [Ginn's] stock to vest if [it] had known that on the [night before signing the Separation Agreement], he had copied all of th[e] company files and retained them." Further, it took "two years" after filing suit before NCI "even knew that [Ginn had] downloaded [NCI documents] to an external hard drive." And, according to Dobbins, Ginn used the NCI documents to create his business plan for Green-Span.[12]

Todd Moore, NCI's general counsel, testified that he was involved in drafting the Separation Agreement when Ginn "resigned" from his position at NCI. Moore explained that when a NCI employee is "fired," he is not "given two more weeks of access to confidential documents of the company as . . . Ginn was." He further noted that had Ginn been "fired," or his employment "terminated" at the March 14, 2008 meeting, he would not "have been allowed to continue to work with the company and have access to" company materials. And it is not NCI's policy to enter into a separation agreement when someone's employment is "terminated."

Moore further testified that, at the time of Ginn's resignation, he was not aware that Ginn owned the Rice laptop and NCI information was located on it. It

---

[12] During his testimony, Dobbins also identified several NCI documents that were found to be on the Acer computer.

was not until 2011 that NCI became aware that Ginn "had actually downloaded all [of NCI's] documents the night before he signed the Separation Agreement." Moore explained that NCI would not have executed the Separation Agreement if it had known at the time that "Ginn had downloaded everything on his Rice computer . . . to an external hard drive." And Ginn was not given permission to download and retain NCI documents.

Quintin Prior, vice-president of IT operations for NCI, testified that in 2005, Ginn "request[ed]" to have the Rice laptop, "sync[ed]" with his work computer. According to Prior, this is generally not allowed because it creates a "security problem" or "security risk" when "company data [is] on a personal laptop outside the organization." However, because Ginn was "who he was," IT complied with the request. Due to the synchronization of the Rice laptop with his work computer, all information available on Ginn's work computer also appeared on the Rice laptop, and vice versa.

In regard to the use of external hard drives, Prior explained that it is also against company policy for employees to purchase and use such drives because if the external hard drive is "stolen or misplaced, the [company] data [on the drive] could be accessed or stolen or used inappropriately." And Prior could not find any evidence showing that NCI had purchased and provided the Seagate hard drive for

23

Ginn's use. Prior had no knowledge of that particular hard drive, contrary to Ginn's testimony.

Prior further testified that on March 27, 2008, after he had been informed of Ginn's resignation from NCI, he was tasked with "get[ting] any [NCI] data off of [Ginn's work computer] and secur[ing] the laptop." To complete the process, Prior, with Ginn's assistance, copied all of Ginn's personal data on his work computer onto two thumb drives. He then proceeded to "wipe [Ginn's work computer] clean" in order to remove all NCI data. During the process, Prior also asked Ginn whether he had "any other company data that [NCI] should be aware of," to which Ginn responded, "No." Although Prior did not specifically ask Ginn about the Rice laptop or its contents, he meant his question to encompass "all data, whether it was on . . . the Rice laptop or not." It included "anything" where Ginn might have stored data because Prior could not "be certain [whether Ginn] ha[d] other devices [that] he may have copied [NCI] data on[to]." And Ginn did not inform Prior of the Buffalo hard drive onto which Ginn had copied NCI documents and information.

Cheri Carr, NCI's computer forensics expert, testified about the computers owned by Ginn and the devices found to have been connected to those computers. In regard to the Rice laptop, Carr explained that 18,000 files had been transferred from the Rice laptop to the Buffalo hard drive the night before Ginn signed the

Separation Agreement. According to Carr, the backup of files from the Rice laptop to the Buffalo hard drive took approximately six hours and ended at two o'clock in the morning on March 27, 2008.

In regard to the Acer computer, the computer that Ginn obtained shortly after leaving NCI, Carr testified that the Buffalo hard drive had been connected to the Acer computer from April 2008 through August 2008. And 16,000 of the 18,000 files that had been downloaded onto the Buffalo hard drive from the Rice laptop were transferred to the Acer computer during this time. Further, seventy files that were located on the Buffalo hard drive were opened on the Acer computer. And some of the files located on the Acer computer included "NCI" in their file path. However, Carr explained that she did not actually look at the content of any file on any of the devices, including those files found on the Acer computer.

Carr further testified that NCI did not receive either the Buffalo hard drive or the Acer computer from Ginn until August 2011. It was only after receiving these devices that she was able to determine exactly how many files had been backed up onto the Buffalo hard drive from the Rice laptop the night before Ginn signed the Separation Agreement.

In regard to damages, NCI's expert, Bryan Van Uden, testified that NCI incurred damages resulting from Ginn's fraud in the amount of $1,941,509, which

25

encompassed the value of Ginn's salary, $359,342, including the amount of taxes NCI paid on Ginn's behalf, and the value of the stock that vested pursuant to the Separation Agreement. Van Uden explained that 67,326 shares of stock vested on March 30, 2008 "as a result of [Ginn] entering into" the Separation Agreement. At that time, the price per share was $23.51, making the gross value of Ginn's vested stock $1,582,840. However, Ginn was required to pay one cent per each share he was awarded; therefore, "the net value of the shares that were vested to . . . Ginn as part of th[e] [S]eparation [A]greement" was $1,582,167.[13]

### *Jury Charge and Findings*

The trial court submitted to the jury NCI's claims for common-law and statutory fraud, breach of fiduciary duty, and unjust enrichment. The trial court also submitted to the jury the question of whether Ginn's employment had been terminated without cause. The jury found Ginn liable for common-law and statutory fraud, breach of fiduciary duty for copying NCI's confidential information with the intent to use or disclose it other than for the benefit of NCI, and unjust enrichment. It did not find that Ginn had breached his fiduciary duty by using or disclosing the confidential information that he had gained during his

---

[13] Van Uden also testified regarding the amount of unjust-enrichment damages and breach-of-fiduciary-duty damages incurred by NCI. Ginn's own damages expert, Saul Solomon, similarly testified that Ginn's "net gain" from the shares of stock that vested pursuant to the Separation Agreement was $1,582,167. And the value of compensation that Ginn received from NCI "at the time he signed th[e] [Separation] [A]greement" was $1,941,509.

26

employment with NCI or that NCI terminated Ginn's employment "without cause." The jury awarded NCI $359,342 in damages for the salary that it had paid to Ginn, but it did not award NCI any damages for the stock that vested on March 30, 2008 pursuant to the Separation Agreement.

***Post-Verdict Motions and Judgment***

Both parties filed several post-verdict and post-judgment motions. In its motions, NCI requested that the trial court disregard the jury's finding of zero damages for the NCI stock that had vested pursuant to the Separation Agreement, find that the evidence conclusively established that Ginn's fraud and breach fiduciary duty caused NCI damages totaling $1,941,509, rescind the Separation Agreement, and order Ginn to pay NCI $1,941,509 plus its attorney's fees. In his motions, Ginn asked the trial court to, among other things, disregard the jury's finding of statutory fraud and award him his attorney's fees. Ginn also requested that the trial court issue findings of fact and conclusions of law on his claim for attorney's fees.

The trial court granted Ginn's request to disregard the jury's finding of statutory fraud, concluding that the Separation Agreement "did not constitute a transaction involving stock in a corporation or joint stock company."[14] The trial court also, per NCI's request, disregarded the jury's finding of zero damages for

---

[14] *See* TEX. BUS. & COM. CODE § 27.01(a).

the NCI stock that had vested pursuant to the Separation Agreement. And it entered judgment in NCI's favor, rescinding the Separation Agreement and ordering Ginn to repay the consideration that he had received pursuant to the Separation Agreement in the amount of $1,941,509. The trial court declined to award attorney's fees to either party.[15]

Finally, the trial court, over NCI's objection, entered the following findings of fact and conclusions of law related to Ginn's claim for attorney's fees:

1.      . . . [A]ll issues relating to Defendant Kelly Ginn's Counterclaim for Attorney['s] fees under the provisions of Section 15.51(c) of the Texas Business & Commerce Code were for the Court and not the jury. . . . [;]

2.      . . . [T]he restrictive covenants in the March 27, 2008 [Separation] Agreement . . . were unenforceable for failure of consideration. In addition, they contained limitations that were not reasonable in terms of time and scope and imposed a greater restraint than necessary to protect the goodwill or other business interest Plaintiff NCI Building Systems, Inc. ("NCI");

3.      . . . NCI did not know at the time that the [Separation] Agreement was executed that it contained limitations that were unreasonable and imposed a greater restraint than necessary to protect its goodwill or other business interests;

---

[15]     The parties stipulated at trial that each side had incurred reasonable and necessary attorney's fees in the amount of $420,000 in connection with pursuing their dispute through trial, they would incur $90,000 in reasonable and necessary attorney's fees for an appeal to the court of appeals, and they would incur $50,000 in reasonable and necessary attorney's fees for an appeal to the Texas Supreme Court.

4.    . . . NCI sought to enforce the [Separation] Agreement to a greater extent than was necessary to protect its goodwill or other business interests;

5.    The parties stipulated as to the amount of attorney['s] fees incurred by Defendant Kelly Ginn to defend this suit, which amount was stipulated to be $420,000 through the date of entry of judgment in this cause; $90,000 for an appeal to the Court of Appeals[;] and $50,000 for an appeal to the Texas Supreme Court; and

6.    The Court concludes that Defendant Kelly Ginn is not entitled to recover his attorney['s] fees pursuant to the provisions of Section 15.51(c) of the Texas Business & Commerce Code.

### Statutory Fraud and NCI's Attorney's Fees

In its first issue, NCI argues that the trial court erred in disregarding the jury's finding that Ginn committed statutory fraud and not awarding NCI attorney's fees because "the Separation Agreement was a transaction involving stock [in a corporation]."[16]  *See* TEX. BUS. & COM. CODE ANN. § 27.01 (Vernon 2015).

A trial court may disregard a jury finding if the evidence is legally insufficient to support it or if a direct verdict would have been proper because a legal principle precludes recovery.  TEX. R. CIV. P. 301; *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991); *Williams v. Briscoe*, 137

---

[16]    NCI also asserts that the trial court properly denied Ginn's motion to strike NCI's fifth amended petition, which contained its statutory-fraud claim.  The propriety of the trial court's denial of Ginn's motion to strike is raised by Ginn in his direct appeal and is addressed below.

29

S.W.3d 120, 124 (Tex. App.—Houston [1st Dist.] 2004, no pet.); *John Masek Corp. v. Davis*, 848 S.W.2d 170, 173 (Tex. App.—Houston [1st Dist.] 1992, writ denied). Because the trial court's decision to disregard the jury's statutory-fraud finding was based upon a legal conclusion, we review the ruling de novo. *Hous. Lighting & Power Co. v. City of Wharton*, 101 S.W.3d 633, 638 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

Texas law prohibits false representations in transactions involving stock in corporations. TEX. BUS. & COM. CODE ANN. § 27.01; *Tukua Invs., LLC v. Spenst*, 413 S.W.3d 786, 796 (Tex. App.—El Paso 2013, pet. denied) ("Section 27.01 applies to false misrepresentations or promises made to induce another to enter into a contract for the sale of real property or stock."). The trial court submitted NCI's statutory-fraud claim to the jury, and the jury affirmatively found that Ginn "committed statutory fraud against NCI in connection with the March 27, 2008 [Separation] [A]greement." In his motion to disregard the jury's statutory-fraud finding, Ginn argued that NCI's statutory-fraud claim failed as a matter of law because the Separation Agreement did not constitute "a contract or transaction involving the conveyance or transfer of stock [in a corporation]." The trial court granted Ginn's motion and disregarded the jury's statutory-fraud finding, concluding that "the March 27, 2008 Separation Agreement did not constitute a transaction involving stock in a corporation . . . as required by Texas Business and

30

Commerce Code section 27.01(a)." The trial court also denied NCI's request for attorney's fees under section 27.01(e).[17]

### *Transaction Involving Stock*

To establish a statutory-fraud claim, a plaintiff must prove: (1) a transaction involving real estate or stock; (2) during the transaction, the other party made a false representation of fact, made a false promise, or benefitted by not disclosing that a third party's representation was false; (3) the false representation or promise was made for the purpose of inducing the party to enter into a contract; (4) the party relied on the false representation or promise by entering into the contract; and (5) the reliance caused the party injury. TEX. BUS. & COM. CODE ANN. § 27.01. Thus, a viable claim for statutory fraud must relate to "a transaction involving real estate or stock in a corporation." *Id.*; *see also Evans v. Wilkins*, No. 14-00-00831-CV, 2001 WL 1340356, at *3 & n.3 (Tex. App.—Houston [14th Dist.] Nov. 1, 2001, no pet.) (not designated for publication).

Courts have "strictly" interpreted this requirement, holding that for fraud in a transaction to be actionable under section 27.01, the contract must "actually effect the conveyance" of real estate or stock between the parties, and it "cannot merely be tangentially related or a means for facilitating a conveyance" of real

---

[17] In its motions for judgment, to disregard certain jury findings, and for partial judgment notwithstanding the verdict, NCI requested attorney's fees based upon the jury's statutory-fraud finding. *See* TEX. BUS. & COM. CODE ANN. § 27.01(e).

estate or stock. *Evans*, 2001 WL 1340356, at \*3; *see also Stanfield v. O'Boyle*, 462 S.W.2d 270, 271 (Tex. 1971) (concluding predecessor statute to section 27.01 "applicable only when a conveyance of the property has been made" (internal quotations omitted)); *Tex. Commerce Bank Reagan v. Lebco Constructors, Inc.*, 865 S.W.2d 68, 82 (Tex. App.—Corpus Christi 1993, writ denied) ("Texas courts have not interpreted section 27.01 that broadly."). In order words, the contract must *cause* stock to be conveyed. *See BLM of Brownwood, Inc. v. Mid-Tex Cellular, Ltd.*, No. 11-11-00311-CV, 2014 WL 1285765, at \*6 (Tex. App.—Eastland Mar. 31, 2014, no pet.) (mem. op.); *Tukua Invs.*, 413 S.W.3d at 796–97; *Evans*, 2001 WL 1340356, at \*3; *see also Life Ins. Co. of Va. v. Murray Inv. Co.*, 646 F.2d 224, 227 n.2 (5th Cir. 1981). A transaction occurs when there is a sale or a contract to sell real estate or stock between the parties. *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 611 (Tex. App.—Waco 2000, pet. denied); *Nolan v. Bettis*, 577 S.W.2d 551, 556 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.).

NCI asserts that "the Separation Agreement without doubt effected the transfer of stock to Ginn." Ginn responds that "the Separation Agreement was not one for the sale or conveyance of stock," but instead "effectuated Ginn's separation from NCI." He asserts that his "stock awards had already been conveyed prior to the [Separation] Agreement" by virtue of the Restricted Stock Agreements.

This Court has previously held, in regard to a statutory-fraud claim involving stock options, that the options must vest in order for section 27.01 to apply. *Stephanz v. Laird*, 846 S.W.2d 895, 905 (Tex. App.—Houston [1st Dist.] 1993, writ denied); *see also Wright v. Modern Grp., Ltd.*, No. 13-12-00293-CV, 2013 WL 4714930, at *9–10 (Tex. App.—Corpus Christi Aug. 30, 2013, pet. denied) (mem. op.) (no statutory-fraud claim because "stock was unvested"); *Beebe v. Compaq Computer Corp.*, 940 S.W.2d 304, 307 (Tex. App.—Houston [14th Dist. 1997, no pet.) (relying on *Stephanz* and holding claim under "Texas Securities Act's anti-fraud provisions" barred because "stock options did not vest"). In other words, when an agreement only grants unvested stock, it does not constitute a transfer or conveyance of stock that implicates section 27.01. *See Stephanz*, 846 S.W.2d at 905.

In *Stephanz*, the agreement at issue granted unvested stock options to the plaintiff-employee "exercisable at varying intervals." *Id.* at 900, 905. Before the plaintiff's stock options began to vest, however, he had to meet "certain conditions precedent," including employment with the corporation for a period of eighteen months. *Id.* at 905. Because the conditions precedent were not satisfied and the stock had therefore not vested, we concluded that the agreement did not give rise to a claim under section 27.01. *Id.* Simply put, there was no transfer or conveyance of stock. *See id.*

Here, like the stock agreement in *Stephanz*, the Restricted Stock Agreements, which Ginn asserts "conveyed" him stock, only actually awarded Ginn stock shares that would later vest upon certain conditions precedent. *Cf. id.*; *see also Wright*, 2013 WL 4714930, at \*9–10. Thus, contrary to Ginn's assertions, the Restricted Stock Agreements did not convey to him the stock shares now at issue.

However, unlike the Restricted Stock Agreements, the Separation Agreement did actually convey stock to Ginn. In fact, the Separation Agreement directly and immediately transferred ownership of stock to Ginn by providing that "[a]ll Restricted Stock Awards granted to Ginn prior to December 31, 2007 will fully vest on March 30, 2008" and imposing no conditions precedent on the vesting of the stock. *Cf. Stephanz*, 846 S.W.2d at 905; *Wright*, 2013 WL 4714930, at \*9–10. Because the parties executed a contract for the conveyance of stock, NCI's claim for statutory fraud under section 27.01 is not barred due to the absence of "a transaction involving real estate or stock." *See* TEX. BUS. & COM. CODE ANN. § 27.01(a). Thus, the trial court properly submitted to the jury the question of whether Ginn had committed statutory fraud.

Accordingly, we hold that the trial court erred in concluding that the Separation Agreement did not constitute a transaction involving stock and disregarding the jury's finding that Ginn committed statutory fraud.

*NCI's Attorney's Fees Under Section 27.01(e)*

Generally, a party may not recover attorney's fees unless authorized by statute or contract. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 120 (Tex. 2009). Section 27.01 allows the recovery of attorney's fees upon the successful prosecution of a statutory-fraud claim. TEX. BUS. & COM. CODE ANN. § 27.01(e) ("Any person who violates the provisions of this section shall be liable to the person defrauded for reasonable and necessary attorney's fees . . . .").

Here, the jury found Ginn liable for statutory fraud, and the parties entered a stipulation in regard to the amounts of their reasonable and necessary attorney's fees. Ginn, however, asserts that the Texas Covenants Not to Compete Act (the "Act") preempts NCI from recovering attorney's fees under any law, including section 27.01. *See id.* § 15.52 (Vernon 2011). In response, NCI asserts that the Act is limited to actions that seek to enforce covenants not to compete and "NCI's case was about Ginn's fraud and breaches of fiduciary duty that induced NCI to enter into an agreement paying [Ginn] almost $2 million in compensation."

The Texas Supreme Court has generally defined covenants-not-to-compete governed by the Act as those "[c]ovenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees." *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 327

35

(Tex. 2014). When the Act applies, Texas Business and Commerce Code section 15.52 provides:

> The criteria for enforceability of a covenant not to compete provided by Section 15.50 of this code and the procedures and *remedies in an action to enforce a covenant not to compete provided by Section 15.51 of this code are exclusive and preempt any* other criteria for enforceability of a covenant not to compete or procedures and *remedies in an action to enforce a covenant not to compete under common law or otherwise.*

TEX. BUS. & COM. CODE ANN. § 15.52 (emphasis added).

Under section 15.51, an employee, not an employer, is entitled to recover attorney's fees in an action to enforce a covenant not to compete. *Id.* § 15.51(c) (Vernon 2011) (providing court may award employee "costs, including reasonable attorney's fees," but containing no provision for award of fees to employer); *Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 645 (Tex. App.— Houston [1st Dist.] 2010, pet. denied) ("[T]he . . . Act does not permit employers to recover their attorney's [fees] in suits to enforce their rights . . . ."). Thus, if the Act applies in this case, then NCI, as Ginn's former employer, may not recover attorney's fees under the Act or any other law. *See* TEX. BUS. & COM. CODE ANN. § 15.51(c); *Glattly*, 332 S.W.3d 645.

Among its other claims, NCI sued Ginn for breach of the non-competition and non-solicitation provisions in the Separation Agreement. In its initial petition, NCI alleged that, pursuant to the Separation Agreement,

Ginn agreed . . . that he would not, for five years, engage in any business that manufacturers or sells any products or services that are the same as, or similar to, those that are manufactured and sold by NCI within 250 miles of NCI's manufacturing facilities. Ginn also agreed not to solicit NCI's customers or hire NCI's employees during this time period.

According to NCI, Ginn "violated his non-compete agreements by starting a new business called Green-Span Profiles, L.P. that manufactures and sells insulated metal panels . . . within 250 miles of NCI's manufacturing facilities," and he "violated his non-solicitation agreements by soliciting NCI's customers." Accordingly, NCI sought "monetary damages caused by Ginn's breaches of contract" and to enjoin him from "starting a new business that competes with NCI . . . [and] soliciting NCI's customers."[18]

The trial court denied NCI's application for temporary injunction to the extent that it sought "enforcement of the non-compete provisions of the March 27, 2008 [Separation] Agreement."[19] And, subsequently, Ginn moved for summary

---

[18] NCI makes these same allegations in its fifth amended petition—NCI's live pleading at the time of trial. And pursuant to its fifth amended petition, NCI similarly sought recovery of "all damages" caused by Ginn's breaches of the Separation Agreement's non-competition and non-solicitation provisions and to enjoin Ginn "from competing with NCI" and soliciting NCI employees, customers, and vendors.

[19] We note that, in support of its application for temporary injunction, NCI filed its Trial Brief Addressing Texas Law on the Enforceability of Non-Competition, Non-Solicitation, Non-Disclosure, and Non-Recruitment Agreements, in which it argued that the Separation Agreement's non-competition and non-solicitation provisions were enforceable under the Act. *See* TEX. BUS. & COM. CODE ANN. § 15.50 (Vernon 2011) (providing criteria for enforceability of covenants not to

judgment on NCI's breach-of-non-compete-covenant claims, which the trial court granted. In doing so, the trial court found that the Separation Agreement's non-competition provision and the non-solicitation provision, as it relates to NCI customers, "are subject to section 15.50 of the Texas Business and Commerce Code" and "are unenforceable for lack of consideration." Accordingly, the trial court dismissed NCI's breach-of-contract claims and "claims for injunctive relief" that were based on the Separation Agreement's non-competition provision and non-solicitation provision, to the extent that it relates to customers, with prejudice. Following the trial court's summary-judgment ruling, NCI non-suited its remaining breach-of-contract claims.

In its briefing, NCI notes that it "nonsuited" its "prior pleaded . . . claim seeking to enforce [the Separation Agreement's] noncompete [provision]." And it asserts that "a pleaded but nonsuited cause of action to enforce a noncompete" should not "preempt[] the recovery of relief available pursuant to other causes of action that were actually tried."

Our review of the record, however, reveals, as stated above, that Ginn moved for summary judgment on NCI's claim for breach of the Separation Agreement's non-competition and non-solicitation provisions. And the trial court

---

compete); *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 795 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ("[T]he . . . Act provides the criteria for enforceability of a covenant not to compete.").

rendered partial summary judgment on NCI's claims, dismissing them with prejudice. Further, it was not until after the trial court had rendered summary judgment that NCI nonsuited its *remaining* contract claims.[20]

A partial summary judgment is a decision on the merits and becomes final upon the disposition of the other issues in the case. *Newco Drilling Co. v. Weyand*, 960 S.W.2d 654, 656 (Tex. 1998). NCI cannot avoid the trial court's ruling on its enforcement claims by subsequently non-suiting its other contract claims. *See id.* ("[A] plaintiff cannot avoid the effects of a partial summary judgment by subsequently filing a nonsuit . . . ."); *Hyundai Motor Co. v. Alvarado*, 892 S.W.2d 853, 855 (Tex. 1995) ("Once a judge announces a decision that adjudicates a claim, that claim is no longer subject to the plaintiff's right to nonsuit."). Here, the trial court actually ruled on the merits of NCI's claims seeking enforcement of the Separation Agreement's covenant not to compete, and NCI did not actually move to nonsuit its claims for breach of the non-competition and non-solicitation provisions. Accordingly, NCI's "nonsuit" argument is untenable.[21]

---

[20] As NCI's trial counsel stated at a hearing before the trial court, "[W]e have decided to abandon[] all of the contract claims that you have not granted Summary Judgment on."

[21] We also note that in its "Cross-Appellant's Brief," NCI concedes that it pursued "claims for breach of the non-competition and non-solicitation covenants," the trial court granted partial summary judgment on those claims, and the Act applied to those claims.

Because the Act preempts NCI's claim for attorney's fees under section 27.01 and the Act does not allow employers to recover attorney's fees in suits to enforce covenants not to compete, we hold that the trial court did not err in denying NCI's claim for attorney's fees. *See* TEX. BUS. & COM. CODE ANN. §§ 15.51(c), 15.52.

We overrule NCI's first issue.[22]

## Reliance

In his eighth issue, Ginn argues that the trial court erred in not rendering judgment that NCI take nothing on its claims for common-law fraud and unjust enrichment because NCI "failed to obtain a finding on the necessary element of . . . reliance." He further argues that because "NCI did not submit the necessary element[]" of reliance on "its misrepresentation claims," it "waived those claims, and the trial court should have disregarded the jury's answer to NCI's misrepresentation . . . and unjust enrichment claim[s]."

To establish common-law fraud, NCI was required to prove that: (1) Ginn made a material representation; (2) the representation was false; (3) when Ginn

---

[22] In its second issue, NCI argues that "[t]he trial court erred by granting the partial summary judgment on NCI's claims for breach of the non-competition and non-solicitation covenants." However, NCI also "requests" that we only consider this issue "[i]n the event [that] this Court sustains Ginn's attacks on the trial court's decision to award NCI $1,582,167 for the value of the stock." Due to our disposition of the issues in Ginn's appeal below, we do not address NCI's second issue. *See infra*.

40

made the representation, he knew it was false or he made it recklessly without any knowledge of the truth and as a positive assertion; (4) Ginn made the representation with the intent that NCI should act on it; (5) NCI acted in reliance on the representation; and (6) NCI suffered injury. *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009).

> Here, the trial court, in Question No. 1 of its charge, asked the jury:
>
> Did Kelly Ginn commit common law fraud against NCI in connection with the March 27, 2008 agreement?

In Question No. 10, the trial court asked the jury:

> Has Kelly Ginn been unjustly enriched at NCI's expense?
>
> A party is unjustly enriched when he has obtained a benefit by fraud.

The trial court, under both questions, instructed the jury:

> Fraud occurs when:
>
> 1. a party makes a material misrepresentation, and
>
> 2. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and
>
> 3. the misrepresentation is made with the intention that it should be acted on by the other party, and
>
> 4. the other party relies on the misrepresentation and thereby suffers injury.

And the trial court further instructed the jury:

41

"Misrepresentation" means a false statement of fact, or a promise of future performance made with an intent, at the time the promise was made, not to perform as promised;

or

1. a party fails to disclose a material fact within the knowledge of that party, and

2. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, and

3. the party intends to induce the other party to take some action by failing to disclose the fact, and

4. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

Ginn argues that the trial court erred in instructing the jury on fraud and misrepresentation because its instructions did not require the jury to find that NCI had "actually and justifiably" relied on Ginn's alleged misrepresentations. Ginn proposed an instruction that, in regard to the element of reliance, reads, "NCI actually and justifiably relied upon Ginn's representation in entering into a binding agreement." He argues that because the trial court's instruction did not include language explaining that reliance had to be both "actual and justifiable," "NCI did not submit [a] necessary element of its . . . misrepresentation claims." In response, NCI asserts that "the issue of actual reliance was submitted to the jury . . . [a]nd in doing so, the issue of justifiability was likewise submitted."

We review a trial court's decision to submit or refuse a particular jury instruction for an abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *Moss v. Waste Mgmt. of Tex., Inc.*, 305 S.W.3d 76, 81 (Tex. App.— Houston [1st Dist.] 2009, pet. denied). A trial court has wide discretion in submitting jury instructions and questions. *Id.* This discretion is subject only to the requirement that the questions submitted must: (1) control the disposition of the case; (2) be raised by the pleadings and the evidence; and (3) properly submit the disputed issues for the jury's determination. TEX. R. CIV. P. 277, 278; *Moore v. Kitsmiller*, 201 S.W.3d 147, 153 (Tex. App.—Tyler 2006, pet. denied). "When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict." *Shupe*, 192 S.W.3d at 579. The omission of an instruction constitutes reversible error only if the omission probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a). "Error in the omission of an issue is harmless 'when the findings of the jury in answer to other issues are sufficient to support the judgment.'" *See Shupe*, 192 S.W.3d at 579–80 (*Boatland of Hous., Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980)).

As an initial matter, we note that Ginn, in his briefing, appears to use the terms "justifiable reliance" and "reasonable reliance" interchangeably. At times, he asserts that the trial court's charge to the jury "did not require NCI to establish that it justifiably relied on Ginn's representations," but he also argues that the jury made "no affirmative finding that NCI reasonably relied on any statement" made by him. However, it is important to not conflate these two concepts. Notably, "justifiable reliance" does not incorporate the concept of reasonableness in its definition. The Texas Supreme Court has looked to the Restatement (Second) of Torts when discussing the concept of "justifiable reliance." *See, e.g.*, *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577–80 (Tex. 2001). As explained in the Restatement:

> Although the plaintiff's reliance on the misrepresentation must be justifiable, . . . this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases. . . . There will be cases in which a plaintiff may be justified in relying upon the representation, even though his conduct in doing so does not conform to the community standard of knowledge, intelligence, judgment or care. Thus, under the rule stated in § 540, the recipient of a fraudulent misrepresentation is not required to investigate its truth, even when a reasonable man of ordinary caution would do so before taking action; and it is only when he knows of the falsity or it is obvious to him that his reliance is not justified.

RESTATEMENT (SECOND) OF TORTS § 545A cmt. b (1977); *see also id.* § 540 ("The recipient of a fraudulent misrepresentation of fact is justified in relying upon its

44

truth, although he might have ascertained the falsity of the representation had he made an investigation."); *id.* § 545A cmt. a ("A fraudulent misrepresentation is an intentional tort. As in the case of other intentional harm, . . . the plaintiff's recovery is not barred by his own negligence which has contributed to his loss. He is, in other words, not required in all cases to exercise the care of a reasonable man for his own protection."). Thus, although Ginn refers to "reasonable reliance" in his briefing, we focus on whether the trial court erred in not including Ginn's requested instruction that NCI "actually and justifiably relied upon Ginn's representations," rather than whether "NCI [f]ailed to [s]ecure" the "[n]ecessary [f]inding[]" of "reasonable reliance."

In support of his assertion that NCI was required to prove that its reliance on Ginn's misrepresentations was actual and justifiable, Ginn relies on the Texas Supreme Court's decisions in *Ernst & Young* and *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913 (Tex. 2010). Notably though, unlike in the present case, the fraudulent misrepresentations made in *Ernst & Young* and *Grant Thornton* were not made to induce a particular party into an action. Instead, the plaintiffs in those cases were third parties and not the immediate targets of the defendants' misrepresentations. *See Grant Thornton*, 314 S.W.3d at 914–18; *Ernst & Young*, 51 S.W.3d at 574–77. Accordingly, the supreme court determined that the "reason-to-expect standard" articulated in the Restatement (Second) on Torts

45

should be applied in such situations, and it explained that a third-party plaintiff's reliance "must be 'especially likely' and justifiable, and the transaction sued upon must be the type the defendant contemplated." *Ernst & Young*, 51 S.W.3d at 580.

The Committee on Pattern Jury Charges in Texas, in regard to fraud, has likewise explained that "in cases not involving representations made to induce a specific party, the reliance element may need to include 'actually and justifiably relied upon the representation.'" Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* 105.2 PJC (2010). Notably though, the pertinent pattern jury charge emphasizes a distinction between the reliance required when the alleged fraud involves direct communications intended to induce a specific party to act and the reliance needed when the alleged fraud involves indirect communications to third parties. *Id.* In situations where a plaintiff is the immediate target of a defendant's misrepresentation, the pattern jury charge comment notes that "the jury should be asked *only* to consider the plaintiff's reliance and not asked to find whether that reliance [is] justified." *Id.* (emphasis added). Such language is necessary to preclude the jury from imposing an additional burden upon the plaintiff, namely requiring that the plaintiff show that he could not have discovered the fraud by exercising proper care. *See id.* (instructing jury plaintiff has to show justifiable reliance could impermissibly result in jury evaluating whether reliance reasonable).

46

As discussed above, "justifiable reliance" is not the same as "reasonable reliance," and the Texas Supreme Court has specifically held that a victim of fraud is generally under no duty to discover the truth by exercising proper care. *See Koral Indus. v. Sec.–Conn. Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex. 1990) (disapproving of jury question and instruction which asked whether party acted reasonably in relying on another party's representation); *see also Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983) ("Where one has been induced to enter into a contract by fraudulent representations, the person committing the fraud cannot defeat a claim for damages based upon a plea that the party defrauded might have discovered the truth by the exercise of proper care." (internal quotations omitted)). Thus, in a fraud case, it is important to ensure that the jury does not equate "justifiable reliance" with "reasonable reliance," especially because the ordinary definition of "justify" incorporates the concept of reasonableness. *See* WEBSTER'S DICTIONARY 680 (11th ed. 2003) (defining "justify" as "to prove or show to be just, right, or reasonable").

Here, the trial court's charge to the jury, in regard to common-law fraud and unjust enrichment, required that the jury find that NCI relied on Ginn's misrepresentations. *See Aquaplex*, 297 S.W.3d at 774 (listing elements of common-law fraud cause of action); *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 105.2. In doing so, the issue of whether

NCI's reliance was justified was likewise submitted. Contrary to Ginn's assertions, "actual reliance" and "justifiable reliance" are not mutually exclusive concepts; rather measuring justifiability, i.e., whether a party knew that a misrepresentation was false, constitutes part of determining whether a party actually relied upon the misrepresentation. *See Grant Thornton*, 314 S.W.3d at 923 (explaining proper inquiry whether "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part" (internal quotations omitted)); *Anglo-Dutch Petroleum Int'l, Inc. v. Case Funding Network, LP*, 441 S.W.3d 612, 631 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (reliance justified when party does not have "actual knowledge of the representation's falsity"); *Mayes v. Stewart*, 11 S.W.3d 440, 451 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("Actual knowledge is inconsistent with the claim that the defrauded party has been deceived, and it negates the essential element of reliance . . . ."). Thus, contrary to Ginn's assertion, the trial court's instruction, in regard to both common-law fraud and unjust enrichment, did require the jury to find that NCI had justifiably relied on Ginn's misrepresentation.[23, 24]

---

[23] In fact, during his closing argument, Ginn argued to the jury that "[i]f you know that a fact is not true, you can't rely on it for purposes of establishing or making a fraud claim."

The trial court's charge to the jury properly listed all the elements of common-law fraud in Question No. 1 and Question No. 10. Ginn's proposed instruction, which reads that NCI "actually and justifiably relied upon Ginn's representations," was not reasonably necessary to enable to jury to render a proper verdict. Accordingly, we hold that the trial court did not err in denying Ginn's requested jury instruction. *See Shupe*, 192 S.W.3d at 579.

We overrule Ginn's eighth issue.

### Sufficiency of Evidence

In his seventh issue, Ginn argues that the trial court erred in not rendering judgment that NCI take nothing on its claims for common-law fraud, breach of

---

[24] We note that Ginn also relies on, in support his assertion that "[t]he trial court erred in refusing to charge the jury . . . on the requirement that NCI prove it justifiably relied on Ginn's alleged misrepresentations," *Southwestern Bell Telephone Co. v. John Carlo Texas, Inc.*, 843 S.W.2d 470 (Tex. 1992). However, *Southwestern Bell*, a case involving intentional interference with a contract, is inapplicable here. In *Southwestern Bell*, an issue arose when the jury "was not asked to find, and did not find, that [the defendant] intentionally interfered with" a contract; rather, the jury was asked only to find that the defendant "intentionally failed to timely relocate its facilities." 843 S.W.2d at 472. Additionally, the trial court "refused [the defendant's] request to define 'justification' for the jury." *Id.* The supreme court determined that this error was harmful because "[i]nterference with contractual relations is privileged where it results from the exercise of a party's own rights or where the party possesses an equal or superior interest to that of the plaintiff in the subject matter." *Id.* (internal quotations omitted). In contrast, in the present case, the trial court's charge to the jury did require it to find that NCI justifiably relied on Ginn's misrepresentations because measuring justifiability is part of determining whether NCI actually relied upon them. *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010); *Anglo-Dutch Petroleum Int'l, Inc. v. Case Funding Network, LP*, 441 S.W.3d 612, 631 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Mayes v. Stewart*, 11 S.W.3d 440, 451 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

fiduciary duty/misappropriation, and unjust enrichment because the evidence is legally and factually insufficient to support the jury's findings in favor of NCI on its claims.

When, as here, an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, he must demonstrate that no evidence supports the finding. *Examination Mgmt. Servs., Inc. v. Kersh Risk Mgmt., Inc.*, 367 S.W.3d 835, 839 (Tex. App.—Dallas 2012, no pet.). We will sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id.* at 822. The term "inference" means,

> [i]n the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved . . . .

*Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (internal quotations omitted). "For a jury to infer a fact, it must be able to deduce that fact as a logical consequence from other proven facts." *Id.*

If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (internal quotations omitted). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within th[e] zone of reasonable disagreement." *Id.*

In conducting a factual-sufficiency review, we must examine, consider, and weigh all of the evidence that supports or contradicts the jury's determination. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We note that the jury is the sole judge of the witnesses' credibility, and it may choose to believe one witness over

51

another; a reviewing court may not impose its own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We may set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

### NCI's Common-Law Fraud Claim[25]

Ginn argues that the evidence is legally and factually insufficient to support the jury's finding that he committed common-law fraud against NCI because "there is no evidence that NCI relied on Ginn's alleged [mis]representation[s] about confidential information in negotiating and executing the [Separation] Agreement"; "[t]here [is] no evidence that . . . Ginn . . . made any statement concerning [not competing] with the requisite fraudulent intent"; and Ginn owed NCI no "duty to disclose" that he had taken NCI's confidential information prior to signing the Separation Agreement.

#### *Affirmative Misrepresentations*

To establish fraud by affirmative misrepresentation, NCI was required to prove that: (1) Ginn made a material representation; (2) the representation was

---

[25] As noted above, the trial court, in Question No. 1 of its charge, instructed the jury on two theories of fraud. The first theory concerned Ginn's affirmative misrepresentations that he would not take or use NCI's confidential information, he would not compete against NCI, and he would not solicit NCI employees. The second theory concerned Ginn's failure to disclose that he had taken NCI's confidential information prior to signing the Separation Agreement.

false; (3) when Ginn made the representation, he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) Ginn made the representation with the intent that NCI should act on it; (5) NCI acted in reliance on the representation; and (6) NCI suffered injury. *Aquaplex*, 297 S.W.3d at 774.

Here, Ginn first specifically argues that "the statement that [he] did not have any confidential information . . . could not [serve as] the basis of [NCI's] misrepresentation claim" because "NCI had actual knowledge that Ginn's [Rice] laptop automatically synchronized with the data on NCI's systems."

"Actual knowledge [of fraud] is inconsistent with the claim that the defrauded party has been deceived, and it negates the essential element of reliance . . . ." *Mayes*, 11 S.W.3d at 451. However, "[w]here one has been induced to enter into a contract by fraudulent representations, the person committing the fraud cannot defeat a claim for damages" by arguing that "the party defrauded might have discovered the truth by the exercise of proper care." *Trenholm*, 646 S.W.2d at 933 (internal quotations omitted). "Only actual knowledge is sufficient to defeat a claim for fraud." *Mayes*, 11 S.W.3d at 451.

At trial, Prior, NCI's vice president of IT operations, testified that on March 27, 2008, after he had been informed of Ginn's resignation from NCI, he was tasked with "get[ting] any [NCI] data off of [Ginn's work computer] and

53

secur[ing] th[e] laptop." To complete his task, Prior "wipe[d]" Ginn's work computer "clean" and removed all of NCI's data. At that time, Prior asked Ginn, "Do you have any other company data that [NCI] should be aware of?" Ginn responded, "No." Prior explained that he meant his question to Ginn to encompass "all data, whether it was on . . . the Rice laptop or not," and it included "anything" wherein Ginn might have stored data because Prior could not "be certain [whether Ginn] ha[d] other devices [that] he may have copied [NCI] data on[to]." However, because Ginn did not tell Prior about any NCI files that he had "loaded on to a hard drive," Prior did not "have any idea when [he] finished [his] conversation with [Ginn] that he had an external hard drive" upon which he had "downloaded all of the company's data." Had Prior known about Ginn's external hard drive, he "would have asked for that drive . . . so [NCI] could clean it."

Ginn argues that because Prior "had actual knowledge that Ginn's home computer, the Rice laptop, was synchronized to his [work] computer," Prior and NCI "had actual knowledge that merely removing the data from [Ginn's work] computer would not remove it from [the Rice laptop] and that the alleged statement by Ginn[, that he did not have any other NCI data,] was not true." However, Prior also explained that although he knew that Ginn owned the Rice laptop and it was synchronized with Ginn's work computer, he, at the time of their March 27, 2008

54

meeting, "didn't know if [Ginn] still had the Rice laptop" or "if he was still using it."

Again, only actual knowledge will defeat a claim for fraud. *Mayes*, 11 S.W.3d at 451. The fact that Prior had knowledge that Ginn's Rice laptop, at one time, was synchronized with his work computer does not establish that he had actual knowledge that Ginn possessed NCI data at the time of his departure from the company, especially considering that Ginn had told Prior that he did not have any such data. Whether Prior should have known that Ginn did not tell him the truth is of no moment. *See Koral*, 802 S.W.2d at 651; *Trenholm*, 646 S.W.2d at 933.

Thus, there is some evidence in the record that NCI relied on Ginn's misrepresentation regarding his possession of NCI's confidential information, and this evidence is not so weak that the jury's verdict is clearly wrong or manifestly unjust.

Ginn next argues that his "alleged statement that he would not compete [against NCI] . . . cannot support [NCI's] misrepresentation claim" because "[t]here is no evidence that . . . Ginn . . . made any statement concerning [not competing] with the requisite fraudulent intent." According to Ginn, his promise not to compete cannot form the basis of a fraud claim because it was merely a promise not to do something in the future. He asserts that "[t]he only evidence that

55

NCI cited to show that . . . [he] w[as] aware of the falsity of [his] representations concerning competition was the fact that [he] did eventually compete over a year later."

"A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Aquaplex*, 297 S.W.3d at 774 (internal quotations omitted). However, "[p]roving that a party had no intention of performing at the time a contract was made is not easy, as intent to defraud is not usually susceptible to direct proof." *Id.* at 774–75 (internal quotations omitted). Thus, intent to defraud most often must be proven by circumstantial evidence. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986).

A party's intent is determined at the time that he made the complained-of representation; however, intent may be inferred from the party's acts made after the representation. *Aquaplex*, 297 S.W.3d at 775. While breach of a contract alone does not constitute evidence that a party did not intend to perform, breach combined with "slight circumstantial evidence of fraud" does constitute some evidence of fraudulent intent, enough to support a verdict. *Id.* (internal quotations omitted). "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric*, 708 S.W.2d at 434.

As part of his Separation Agreement with NCI, Ginn agreed to not compete against the company during the year that he served it as a consultant and for five years thereafter. Ginn, however, testified that he purchased, without NCI's knowledge, the Buffalo hard drive after his March 14, 2008 meeting with Chambers and "immediately before" signing the Separation Agreement. Ginn explained that the night before he executed the agreement, he copied "all of NCI's materials," including confidential information, that were on his Rice laptop to the Buffalo hard drive, which he subsequently retained.[26] According to Ginn, the information that he copied was "confidential and proprietary to NCI," "valuable" to NCI, and the "property of NCI."

Ginn also testified that he did not reveal to anyone that he had backed up NCI files to the Buffalo hard drive that he had independently purchased. In fact, when Prior asked Ginn whether he possessed any other confidential NCI data, apart from that which Prior had wiped from Ginn's work computer, Ginn told him, "No." Ginn was also aware of NCI's policy prohibiting the copying of NCI data and NCI's procedures for retrieving company data when an employee left NCI.

Ginn further testified that in December 2008, while being paid as a consultant for NCI, he created his first business plan for his own company, which

_____

[26] Carr, NCI's computer forensics expert, testified that 18,000 files were transferred from the Rice laptop to the Buffalo hard drive the night before Ginn signed the Separation Agreement. And Dobbins explained that there would have been no reason for Ginn to retain such information except to use it to compete with NCI.

57

was to be located in Houston, Texas. The company's purpose was to "manufacture, market and sell insulated panels . . . for use in building construction." Notably, Ginn's plan contained some of the "same" or "identical" language found in the NCI documents that he had retained, and it listed individuals who were employees of NCI as employees of and "people that were going to be involved" with Ginn's new company. According to Ginn, NCI had no knowledge that he was "developing a business plan to compete with [it]."

In January 2009, Ginn began marketing his business plan to investors, including customers and competitors of NCI. In February 2009, he formed and registered his company. And in May 2009, a little over a year after he had signed the Separation Agreement, Ginn began selling insulated metal panels and "started competing with [NCI]."

Despite this evidence, Ginn argues that because he "did not compete with NCI for a year," he "did not have any fraudulent intent." According to Ginn, his "[p]artial performance under a contract negates evidence of an intent not to perform."

Although "partial performance *can* negate an intent not to keep a promise at the time it was made," "Texas law '[does] not hold that partial performance under an agreement conclusively or always refutes the contention that there was no intent to perform.'" *Lightsource Analytics, LLC v. Great Stuff, Inc.*, No. A-13-CV-931

LY, 2014 WL 798069, at *2 (W.D. Tex. Feb. 27, 2014) (quoting *Mobius Risk Grp., LLC v. Global Clean Energy Holdings, Inc.*, No. H-10-1708, 2012 WL 527939, at *5 (S.D. Tex. Feb. 16, 2012)); *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (noting "[p]artial performance *can* negate" intent (emphasis added)).  In fact, "'evidence of partial performance will not preclude a finding of fraud if other evidence indicates an intent not to fully perform.'"  *Lightsource Analytics*, 2014 WL 798069, at *2 (quoting *Mobius Risk Grp.*, 2012 WL 527939, at *5).  Here, even were we to assume that Ginn partially performed, the other evidence noted above serves to establish that he did not intend to fully perform under the Separation Agreement.  *Cf. Shavers v. Sunbelt Equip. Mktg., Inc.*, No. 10-11-00330-CV, 2012 WL 1871605, at *7 (Tex. App.—Waco May 23, 2012, no pet.) (mem. op.) (concluding partial performance did not negate intent not to perform).

Thus, there is some evidence in the record that Ginn possessed the requisite fraudulent intent when he represented to NCI that he would not compete against it, and the evidence supporting the jury's finding that Ginn acted with fraudulent intent is not so weak that the jury's finding is clearly wrong or manifestly unjust.

### *Fraud by Nondisclosure*

To establish fraud by nondisclosure, NCI was required to prove that: (1) Ginn failed to disclose material facts to NCI that he had a duty to disclose;

59

(2) Ginn that knew NCI was ignorant of the facts and it did not have an equal opportunity to discover the facts; (3) Ginn was deliberately silent when he had a duty to speak; (4) by failing to disclose the facts, Ginn intended to induce NCI to take some action or refrain from acting; (5) NCI relied on Ginn's nondisclosure; and (6) NCI was injured as a result of acting without that knowledge. *See Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 850 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

Ginn argues that he "did not owe NCI a duty to disclose any information" because while he and NCI were negotiating the Separation Agreement, he was "negotiating on his own personal behalf" and was not in a fiduciary relationship with NCI. In response, NCI asserts that Ginn, as a corporate officer, owed NCI a duty to disclose information, even during the negotiation of the Separation Agreement.

A failure to disclose information will not support a fraud finding in the absence of evidence of a duty to disclose. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998); *Emerald Tex., Inc. v. Peel*, 920 S.W.2d 398, 403 (Tex. App.—Houston [1st Dist.] 1996, no writ) ("A failure to disclose information is not fraudulent unless one has an affirmative duty to disclose, such as where a confidential or fiduciary relationship exists."). The existence of a duty to disclose is a question of law for the court to decide. *Bradford v. Vento*, 48 S.W.3d 749, 755

60

(Tex. 2001); *Rivers v. Charlie Thomas Ford, Ltd.*, 289 S.W.3d 353, 359 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

A duty to disclose may arise: (1) when the parties have a confidential or fiduciary relationship; (2) when one party voluntarily discloses information, which gives rise to the duty to disclose the whole truth; (3) when one party makes a representation, which gives rise to the duty to disclose new information that the party is aware makes the earlier representation misleading or untrue; or (4) when one party makes a partial disclosure and conveys a false impression, which gives rise to a duty to speak. *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 385 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

Prior to leaving NCI on March 31, 2008, Ginn served as the company's executive vice president of operations. As executive vice president, he was a corporate officer of NCI. Ginn continued in his corporate officer role while he and NCI negotiated the Separation Agreement. In fact, Ginn testified that he owed a fiduciary duty to NCI, because of his position in the company, until he formally left NCI on March 31, 2008, four days after he had signed the Separation Agreement.

It is well established that corporate officers owe fiduciary duties to the companies they serve. *See, e.g.*, *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963); *Myer v. Cuevas*, 119 S.W.3d 830, 836 (Tex. App.—

61

San Antonio 2003, no pet.). And, as a fiduciary, a corporate officer owes a duty "to deal openly" with and "make full disclosure[s]" to his company. *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512–14 (Tex. 1942).

As a corporate officer of NCI, Ginn stood in a fiduciary relationship with NCI, and he, therefore, as a matter of law, had a duty to disclose material facts to NCI during the negotiations of the Separation Agreement.[27]

In sum, we hold that the evidence is legally and factually sufficient to support the jury's finding that Ginn committed common-law fraud against NCI.

We overrule Ginn's seventh issue.[28]

---

[27] NCI also argues that Ginn had a duty to disclose to it material facts because he had made a partial disclosure and gave a false impression that he had not taken, or had returned all of, NCI's confidential information. *See Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 385 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (stating duty to disclose exists where party makes partial disclosure and conveys false impression). We need not address this argument due to our conclusion that Ginn had a duty to disclose based on his fiduciary relationship with NCI.

[28] Having held that the evidence is legally and factually sufficient to support the jury's finding on NCI's fraud claim, we do not reach the portion of Ginn's seventh issue regarding whether the evidence is legally and factually sufficient to support the jury's findings on NCI's breach-of-fiduciary-duty and unjust-enrichment claims. *See* TEX. R. APP. P. 47.1. We also need not address Ginn's ninth issue, in which he argues that "the trial court erred in including both . . . [fraud] theories in charge questions one and ten because such inclusion makes it impossible on review for th[e] Court to determine whether the jury answered in affirmative based upon a permissible theory or an impermissible theory." *See id.*; *see also supra* (holding evidence sufficient to support fraud by affirmative misrepresentation and fraud by nondisclosure).

## Rescission of Separation Agreement

In his third, fourth, fifth, and sixth issues, Ginn argues that the trial court erred in rescinding the Separation Agreement because: (1) NCI did not timely plead for rescission; (2) NCI had an adequate remedy at law through its breach-of-contract claim; (3) NCI elected to seek the remedy of specific performance and continued to benefit from the Separation Agreement after learning of the grounds for rescission; (4) the trial court could not return the parties to the status quo; and (5) NCI failed to establish the value of the consideration that it paid to Ginn. Ginn further asserts that even were rescission an available remedy, the trial court erred in awarding NCI damages, rather than ordering Ginn to return the stock that vested, and concluding that, as a matter of law, NCI incurred restitution damages when there was "a fact issue as to the amount of damages NCI incurred regarding its stock claim."

"Rescission is an equitable remedy that operates to extinguish a contract that is legally valid but must be set aside due to fraud, mistake, or for some other reason to avoid unjust enrichment." *Gentry v. Squires Constr., Inc.*, 188 S.W.3d 396, 410 (Tex. App.—Dallas 2006, no pet.). In fact, rescission has long been a remedy for common-law fraud. *Tex. Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 773 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). Upon rescission, the rights and liabilities of the parties are extinguished, any consideration that was paid

is returned, and the parties are restored to their respective positions as if no contract between them had ever existed. *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 855 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). A trial court may also order a party to pay damages equal to the value of any proceeds or profits the party earned from the consideration that was improperly obtained. *Meadows v. Bierschwale*, 516 S.W.2d 125, 128 (Tex. 1974).

The decision to allow rescission lies strictly within the sound discretion of trial courts. *Tex. Capital Sec.*, 58 S.W.3d at 774. We will not disturb a trial court's decision to grant the equitable remedy of rescission absent a showing that the court abused its discretion. *See State, Acting By and Through Tex. Dep't of Mental Health and Mental Retardation v. Ellison*, 914 S.W.2d 679, 682 (Tex. App.—Austin 1996, no writ). Under the abuse of discretion standard, we must determine whether the trial court acted without reference to any guiding rules or principles; in other words, whether the trial court's decision was arbitrary and unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). We must view the evidence in the light most favorable to the action of the trial court and indulge every legal presumption in favor of the judgment. *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1993, writ denied). There is no abuse of discretion as long as some evidence of substantive and probative character exists to support the trial court's decision. *Id.* The mere

fact that we might have decided the question differently does not demonstrate such an abuse. *Downer*, 701 S.W.2d at 242.

### *Rescission Pleading*

In his fourth issue, Ginn specifically argues that the trial court erred in denying his motion to strike NCI's fifth amended petition because it caused "unfair surprise and prejudice." *See* TEX. R. CIV. P. 63 (governing pleading amendments). Ginn asserts that NCI, in its fifth amended petition, filed eleven days before trial, brought "a new cause of action for fraud in a stock transaction and also requested additional relief in the form of rescission of the [Separation] Agreement and attorney's fees and costs." Ginn further argues that because this pleading was purportedly "untimely," "NCI ha[d] no pleading asserting a claim for rescission of the [Separation] Agreement" and "a 'judgment of the court [must] conform to the pleadings.'"

We review a trial court's decision to grant or strike a pleading amendment for an abuse of discretion. *See Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 939–40 (Tex. 1990). On appeal, the party complaining of the court's ruling bears the burden of demonstrating that the trial court erred. *Hardin v. Hardin*, 597 S.W.2d 347, 349 (Tex. 1980). We note, generally, that "[a]ppellate courts rarely find an abuse of discretion when a trial court refuses to strike an amended pleading

filed more than seven days before trial." *Christensen v. Chase Bank USA, N.A.*, 304 S.W.3d 548, 555 (Tex. App.—Dallas 2009, pet. denied).

A party may amend its pleadings up to seven days before trial unless the amended pleadings operate as a surprise to the opposing party. TEX. R. CIV. P. 63; *Hakemy Bros., Ltd. v. State Bank & Trust Co., Dall.*, 189 S.W.3d 920, 924 (Tex. App.—Dallas 2006, pet. denied). A trial court has no discretion to refuse the amendment unless: (1) the opposing party presents evidence of surprise or prejudice; or (2) the amendment is prejudicial on its face because, for example, it asserts a new cause of action or defense, and the opposing party objects to the amendment.[29] *State Bar of Tex. v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex. 1994); *Greenhalgh*, 787 S.W.2d at 939–40. And we note that an amended pleading is not, as a matter of law, prejudicial to the opposing party simply because it asserts a new cause of action. *Smith Detective Agency & Nightwatch Serv., Inc. v. Stanley Smith Sec., Inc.*, 938 S.W.2d 743, 749 (Tex. App.—Dallas 1996, writ denied).

Ginn, in his motion to strike NCI's fifth amended petition, asserted that NCI, in its new petition, added "a new cause of action for fraud in a stock transaction"[30] and sought "additional relief in the form of rescission of the [Separation]

---

[29] Ginn, in his motion to strike, did not assert that NCI's fifth amended petition was prejudicial on its face.

[30] Ginn also asserted that NCI, in its fifth amended petition, added claims for conspiracy and probable disclosure. NCI nonsuited its probable-disclosure claim prior to trial.

[A]greement and attorney['s] fees and costs." Ginn further asserted that "[i]f the[] last minute claims [were] allowed . . . [he] would be severely prejudiced and denied . . . a reasonable opportunity to prepare a defense to the claims." In support of his assertions, Ginn relied on the five factors enumerated in this Court's opinion in *Hajdik v. Wingate*, 753 S.W.2d 199 (Tex. App.—Houston [1st Dist.] 1988), *aff'd*, 795 S.W.2d 717 (Tex. 1990).

The trial court denied Ginn's motion, concluding that NCI's addition of its statutory-fraud claim "factually . . . doesn't alter anything" because it did not "change[]" what needed to be proved. In other words, "really the same facts" were at issue in both NCI's previously asserted common-law fraud claim and its "fraud in a stock transaction" claim. The trial court also concluded that there was "enough advanced notice of a potential claim for attorney's fees" based on NCI's previous petition.

On appeal, Ginn again asserts that the factors "outlined" in *Hajdik* "required the trial court to strike [NCI's] new claims." In *Hajdik*, we noted that in determining whether a party has shown surprise sufficient to preclude a pleading amendment, a trial court should consider: (1) how long the suit has been on file before the filing of the amendment; (2) how soon before trial the amendment was made; (3) whether the amendment presents a new claim or cause of action; (4) whether the new cause of action is based on recently discovered matters; and

(5) whether the resisting party alleges surprise and inability to prepare to try the new cause of action. 753 S.W.2d at 204. We also later applied these factors in *Stevenson v. Koutzarov*, 795 S.W.2d 313 (Tex. App.—Houston [1st Dist.] 1990, writ denied). There, we held that the trial court had abused its discretion in not striking the amended pleadings. 795 S.W.2d at 321.

In the instant case, as noted by the trial court, NCI, unlike the plaintiffs in *Hajdik* and *Stevenson*, did not allege new facts when it added its statutory-fraud claim in its fifth amended petition. *See Dunnagan v. Watson*, 204 S.W.3d 30, 38 (Tex. App.—Fort Worth 2006, pet. denied) (holding trial court did not abuse its discretion by denying motion to strike where evidence relevant to breach-of-fiduciary-duty claim "overlap[ped] to some extent" with newly added cause of action). *Cf. Stevenson*, 795 S.W.2d at 321 (explaining "two amendments were a wholesale revision of the [plaintiff's] suit"); *Hajdik*, 753 S.W.2d at 203 (noting different facts relevant to new cause of action for fraud). And although NCI asserted additional bases for its claims for attorney's fees and costs, the fact that NCI intended to seek attorney's fees and costs was nothing new and, thus, not a surprise to Ginn. *See Dunnagan*, 204 S.W.3d at 39 (noting plaintiff "did not seek any additional monetary damages" in amended pleading). *Cf. Stevenson*, 795 S.W.2d at 321 (holding trial court abused discretion in not striking amended pleadings which introduced five new causes of action and increased damages

68

sought from "$30,000 to over $16.5 million"). Further, as stated above, an amended pleading that asserts a new cause of action, such as NCI's statutory-fraud claim, will not, as a matter of law, prejudice an opposing party, especially where the "new" cause of action is based upon previously alleged facts. *See Dunnagan*, 204 S.W.3d at 39 ("[T]he fact that [plaintiff's] amended pleading set forth a new cause of action for judicial dissolution is not in and of itself fatal to the amendment."); *Stanley Smith Sec.*, 938 S.W.2d at 749.

Here, it cannot be reasonably be said that the amendments made by NCI in its fifth amended petition constituted a "wholesale revision" of NCI's suit against Ginn. *See Christensen*, 304 S.W.3d at 555 (concluding no abuse of discretion where amendment "did not amount to a wholesale revision of the litigation"). *Cf. Stevenson*, 795 S.W.2d at 321 (holding "because the two amendments were a wholesale revision of the [plaintiff's] suit . . . , the trial court abused its discretion when it denied the motion to strike late pleadings"). We conclude that the trial court's denial of Ginn's motion to strike was not so arbitrary or unreasonable as to amount to an abuse of discretion. Accordingly, we hold the trial court did not err in denying Ginn's motion to strike NCI's fifth amended petition.

Moreover, specifically in regard to NCI's request for recession of the Separation Agreement, we also note that it, in its third amended petition, filed months before trial, requested that the trial court "disgorge the salaries, bonuses,

69

benefits, and any amounts traceable to the vesting of [Ginn's] NCI restricted stock" so that Ginn would not be "unjustly enriched by his unlawful acts." While a trial court may not grant relief to a party in the absence of pleadings to support that relief, Texas courts have traditionally construed pleadings liberally, and in the case of rescission, courts have held that "factual allegations in the petition, coupled with a prayer for general relief, are sufficient to support a decree granting rescission." *Green Tree Acceptance, Inc. v. Pierce*, 768 S.W.2d 416, 421 (Tex. App.—Tyler 1989, no writ); *see also Hannon, Inc. v. Scott*, No. 02-10-00012-CV, 2011 WL 1833106, at *10 (Tex. App.—Fort Worth May 12, 2011, pet. denied) (mem. op.); *Omega Energy Corp. v. Gulf States Petroleum Corp.*, No. 13-03-275-CV, 2005 WL 977573, at *3 (Tex. App.—Corpus Christi Apr. 28, 2005, pet. denied) (mem. op.); *Nelson v. Najm*, 127 S.W.3d 170, 177 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("Customarily, a general prayer for relief will support any relief raised by the evidence that is consistent with the allegations and causes of action stated in the petition."). Further, when the claims and defenses are those which contemplate a particular remedy, a party may be entitled to that remedy despite a failure to specifically plead for such relief. *See Perez v. Briercroft Serv. Corp.*, 809 S.W.2d 216, 218 (Tex. 1991). Thus, even if NCI had not specifically pleaded for rescission prior to its fifth amended petition, it had previously asserted a claim for damages based on fraud. And it is well settled that "[a]s a rule, a party is not

bound by a contract procured by fraud" and rescission is a proper remedy for a contract procured by fraud. *Formosa Plastics Corp.*, 960 S.W.2d at 46; *Tex. Capital Sec.*, 58 S.W.3d at 773.

We overrule Ginn's fourth issue.

### *Election of Remedies and Status Quo*

In his third issue, Ginn specifically argues that the trial court erred in granting rescission because NCI, by seeking and obtaining a temporary injunction from the trial court, elected to pursue specific performance to enforce the Separation Agreement, and "the status quo existing before the [Separation] Agreement was executed" cannot be "restore[d]." He asserts that the temporary injunction obtained by NCI "resulted in a benefit to NCI and substantial detriment to" him and "constitute[d] an irrevocable election of remedies." NCI argues that Ginn "waived his ability to assert the election of remedies defense" because "[h]e did not plead it" or "try to submit a jury question regarding any of the elements necessary to prove it."

Election of remedies is an affirmative defense that Ginn was required to plead, prove, and secure favorable jury findings thereon, unless it was established as a matter of law by undisputed evidence. *Sanderson v. Smith*, No. 12-08-00442-CV, 2010 WL 2784302, at *2 (Tex. App.—Tyler July 14, 2010, pet. denied) (mem. op.); *McHaney v. Hackleman*, 347 S.W.2d 822, 826 (Tex. Civ. App.—San Antonio

1961, writ ref'd n.r.e.); *see also* TEX. R. CIV. P. 94, 279; *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 325 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (defendant had burden to "plead, prove, and secure findings to sustain" his affirmative defense (internal quotations omitted)).

Ginn did not initially plead his election-of-remedies defense, but later sought leave to amend his answer, which the trial court granted.[31] He did not, however, submit a jury question or secure favorable jury findings on the defense. Thus, if Ginn did not establish, by undisputed evidence, his defense of election of remedies, it is waived.[32] *See* TEX. R. CIV. P. 279; *McHaney*, 347 S.W.2d at 826; *see also Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 763 (Tex. App.—El Paso 2000, no pet.) (failure to request jury instruction on affirmative defense results in waiver by party relying on it unless issue conclusively established).

In order for the election-of-remedies doctrine to apply to bar rescission in this case, the evidence must conclusively show that (1) NCI successfully exercised an informed choice (2) between two or more remedies, rights, or states of facts

---

[31] It is not necessary for us to address whether the trial court erred in allowing Ginn to amend his answer. *See* TEX. R. APP. P. 47.1.

[32] We note that Ginn, in his briefing, does not respond to NCI's assertion that he waived his affirmative defense by failing to plead it, prove it, and secure favorable jury findings on it. And he does not argue or explain how undisputed evidence establishes his election-of-remedies defense. *See* TEX. R. APP. P. 38.1(i) (brief must contain clear and concise argument).

(3) which are so inconsistent as to (4) constitute manifest injustice. *Bocanegra v. Aetna Life Ins. Co.*, 605 S.W.2d 848, 851 (Tex. 1980).

Although NCI filed suit in May 2009, it did not assert a cause of action for fraud through which it sought the remedy of rescission against Ginn until 2011. Moore, as NCI's general counsel, testified that it was not until 2011 that NCI learned that Ginn "had actually downloaded all [of NCI's] documents the night before he signed the Separation Agreement" and had retained NCI documents on an external hard drive. And, Carr, NCI's computer forensics expert, explained that NCI did not receive the Buffalo hard drive or Ginn's Acer computer, which contained the NCI files that Ginn had retained, until August 2011. Moreover, it was only after those devices had been turned over to NCI that it was able to determine that 18,000 NCI files had actually been "backed up" onto the Buffalo hard drive from Ginn's Rice laptop the night before Ginn signed the Separation Agreement.[33]

---

[33] We note that Ginn testified at trial that he had falsely represented to NCI, in response to discovery requests, that he had not retained any of NCI's information or documents, including electronically stored information. And it was not until 2011, when NCI specifically requested the Buffalo hard drive and the Acer computer, both of which contained NCI files, that Ginn, for the "first time," acknowledged their existence. It cannot be manifestly unjust to allow NCI to obtain rescission when Ginn's ability to assert an election-of-remedies defense results only from his own deceptive conduct. *See Bocanegra v. Aetna Life Ins. Co.*, 605 S.W.2d 848, 851 (Tex. 1980); *Castle Tex. Prod. Ltd. P'ship v. Long Trusts*, 134 S.W.3d 267, 280 (Tex. App.—Tyler 2003, pet. denied) (stating "most important element in proving election of remedies is manifest injustice").

In regard to election of remedies, the Texas Supreme Court has explained that:

> One's choice between inconsistent remedies, rights or states of facts does not amount to an election which will bar further action unless the choice is made with a *full and clear understanding of the problem, facts, and remedies essential to the exercise of an intelligent choice*.

*Bocanegra*, 605 S.W.2d at 852 (emphasis added). In other words, a party "cannot be held to have made a choice [between inconsistent remedies] when he did not know that any such choice was open to him." *Leonard v. Hare*, 336 S.W.2d 619, 621 (Tex. 1960) (internal quotations omitted).

Here, based on the testimony presented at trial that NCI did not become aware of Ginn's fraudulent conduct until two years after it had initially filed suit and sought a temporary injunction, we cannot conclude that undisputed evidence establishes that NCI "'successfully exercise[d] an informed choice'" to pursue "specific performance" of the Separation Agreement rather than seek rescission based on Ginn's fraudulent conduct.[34] *See Slay v. Burnett Trust*, 187 S.W.2d 377,

---

[34] In connection with his election-of-remedies argument, Ginn also argues that "the trial court erred in granting equitable rescission relief because there was an adequate remedy at law: breach of contract damages." Ginn, however, devotes only a few sentences in both his 51-page opening brief and 75-page reply brief to this argument. Because the issue is inadequately briefed, it is waived. *See* Tex. R. App. P. 38.1(i); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (discussing long-standing rule inadequate briefing waives issue on appeal); *Dunmore v. Chi. Title Ins. Co.*, 400 S.W.3d 635, 643–44 (Tex. App.—Dallas 2013, no pet.) (concluding "[a]ppellants fail[ed] to provide sufficient argument or authority to make their appellate complaint in their third issue viable," where argument "consist[ed] of three sentences").

394 (Tex. 1945) ("[A] party is not [bound] by a selection of one of two remedies unless he made it with knowledge."); *Horizon Offshore Contractors, Inc. v. Aon Risk Servs. of Tex., Inc.*, 283 S.W.3d 53, 59 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (explaining election of remedies only applies in "limited circumstances" when party has made informed choice); *Sanford v. Cobe*, 172 S.W. 584, 585 (Tex. Civ. App.—El Paso 1915, no writ) ("An important element in such election is knowledge of the facts by the party charged with the election. . . . [A] party should not be held bound by an election when he did not know the facts upon which it could be intelligently based." (internal quotations omitted)).

In regard to Ginn's argument that the trial court should not have granted rescission because "the status quo existing before the [Separation] Agreement was executed" cannot be "restore[d]," we note that the ability to return the parties to the status quo is "only one factor" to be considered by a trial court when deciding whether to grant rescission. *See Holt v. Robertson*, No. 07-06-0220-CV, 2008 WL 2130420, at *5–6 (Tex. App.—Amarillo May 21, 2008, pet. denied) (mem. op.); *Ennis v. Interstate Distribs., Inc.*, 598 S.W.2d 903, 906 (Tex. Civ. App.—Dallas 1980, no writ). And rescission is not defeated simply because the prior status quo cannot be achieved. *See Holt*, 2008 WL 2130420, at *5 ("Judicial rescission is an equitable remedy that seeks to set aside an otherwise legal contract due to fraud, mistake, or for some other reason when it is necessary to avoid unjust enrichment

75

of the non-complaining party to the contract, so that the parties thereto may be restored, *insofar as is possible*, to the status or position they were in prior to execution of the contract." (emphasis added)). This is especially true where "equitable considerations . . . obviate the need for restoration of the status quo." *Id.* at \*6.

Although Ginn asserts that he "cannot be put in the position he was in before the Separation Agreement was executed," we have previously stated that "the main concern of courts should be to restore the *plaintiff* to the status quo, not necessarily the defendant." *Summers v. WellTech, Inc.*, 935 S.W.2d 228, 233 (Tex. App.—Houston [1st Dist.] 1996, no writ) (discussing recession under Securities Act); *see also Tex. Capital Sec.*, 58 S.W.3d at 776 ("Rescission is intended to restore *plaintiffs* to their original position." (emphasis added)). Therefore, we cannot conclude that the trial court abused its discretion in ordering rescission of the Separation Agreement because Ginn "cannot go back to 2008 and transact with PUMA to purchase the equipment he needed to start his business," "solicit NCI's employees, with whom he had great relationships," or "get the jump start to his business."

We overrule Ginn's third issue.

### *Return of Consideration Paid*

In his fifth and sixth issues, Ginn, alternatively argues that, even if the remedy of rescission is available to NCI, the trial court still erred in awarding NCI damages because it did not prove restitution damages as a matter of law and the trial court could only order Ginn to return the stock that had vested.

Rescission is an equitable remedy, and the appropriate measure of damages is the return of the consideration paid. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 345 (Tex. 2011). By electing recession, a plaintiff need only prove the amount of damages necessary to restore it to its original position. *Id.* at 346. In *Italian Cowboy*, the Texas Supreme Court explained that by offering detailed expert testimony as to the amount required to make the plaintiff whole, the plaintiff presented legally-sufficient evidence of the amount of damages that it was entitled to recover alongside recession of the contract at issue. *Id.*

Here, the evidence produced at trial conclusively established the value of the consideration that NCI paid to Ginn pursuant to the Separation Agreement. NCI's damages expert, Van Uden, testified that Ginn received 67,326 shares of stock, which, on the date that it vested, had a price of $23.51 per share. *See Pabich v. Kellar*, 71 S.W.3d 500, 509 (Tex. App.—Fort Worth 2002, pet. denied) (explaining for purposes of determining fraud damages, stock valued on date of fraud). Van

Uden, deducting the price that Ginn had paid per share, i.e., one cent per share, then determined that the value of the stock that Ginn received as consideration for the Separation Agreement was $1,582,167. Ginn's damages expert, Solomon, agreed with this calculation of the value of stock, as did Ginn himself. Ginn also testified that he no longer owned the stock that he had received from NCI.

Because Ginn no longer owns the stock that he received from NCI, the trial court could not order him to return it; it could only award NCI damages. "Complete and full justice is a fundamental doctrine of equity jurisprudence, and if damages, as well as rescission, are essential to accomplish full justice, they will both be allowed." *Holland v. W. Bank & Trust Co.*, 118 S.W. 218, 218 (Tex. Civ. App.—Austin 1909, no writ); *see also Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 660 (Tex. 1979) (noting "principle that if damages as well as rescission are essential to accomplish full justice, they will both be allowed"); *Free Sewing Mach. Co. v. S. T. Atkin Furniture Co.*, 71 S.W.2d 604, 605 (Tex. Civ. App.—Austin 1934, no writ) ("A person who has been so defrauded . . . may both rescind and recover damages where both are necessary to make him whole.").

We hold that the trial court, based on the jury's finding that Ginn had committed fraud, did not err in granting NCI's request for recession of the Separation Agreement; nor did it err in ordering Ginn to pay NCI $1,582,167, the value of the stock that he had received pursuant to the Separation Agreement.

We overrule Ginn's fifth and sixth issues.

## Stock Damages

In his first issue, Ginn argues that the trial court erred in "disregarding the jury's finding[] of zero damages regarding NCI's stock claim and rendering judgment awarding NCI damages" because the evidence did not conclusively establish that Ginn's conduct proximately caused NCI damages of $1,582,167.

We review the grant or denial of a motion for judgment notwithstanding the verdict under a legal-sufficiency standard. *Williams v. Dardenne*, 345 S.W.3d 118, 123 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). When a party that bore the burden of proof at trial seeks a judgment notwithstanding the verdict, it must show that the record establishes as a matter of law a proposition that contradicts the jury's finding. *Henry v. Masson*, 333 S.W.3d 825, 849 (Tex. App.—Houston [1st Dist.] 2010, no pet.). "A trial court may not properly disregard a jury's negative finding and substitute its own affirmative finding unless the evidence conclusively establishes the issue." *Id.* Evidence conclusively establishes an issue only when: (1) there is a complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810; *Rosenblatt v. Freedom Life Ins. Co. of Am.*, 240 S.W.3d

315, 319 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Specifically in regard to damages, a trial court may render a judgment notwithstanding the verdict and substitute its own judgment only if the evidence conclusively proves the damages sought by the movant. *State v. Huffstutler*, 871 S.W.2d 955, 960–61 (Tex. App.—Austin 1994, no writ).

Here, the trial court, in its charge, asked the jury to determine whether Ginn had committed fraud. Conditioned on an affirmative answer to that question, the trial court then asked:

> What sum of money, if paid now in cash, would fairly and reasonably compensate NCI for its damages, if any, that resulted from such fraud?
>
> Consider the following elements of damages, if any, and none other.
>
> . . . .
>
> Answer separately in dollars and cents for damages, if any.
>
> - The value of Kelly Ginn's restricted stock that was allowed to vest on March 30, 2008.
>
> - The amount of income and benefits that NCI paid Kelly Ginn from March 31, 2008 through March 31, 2009.

The jury answered $359,342 for "[t]he amount of income and benefits" that NCI paid Ginn, but found zero dollars for "[t]he value of . . . Ginn's restricted stock" that vested on March 30, 2008.

In its Motion to Disregard Certain Jury Findings and Motion for Partial Judgment Notwithstanding the Verdict, NCI asserted that the evidence at trial conclusively established that the stock that had vested under the Separation Agreement was worth $1,582,167. The trial court granted NCI's motion on the jury's finding of "zero dollars for the restricted stock that was allowed to vest on March 30, 2008 pursuant to the March 27, 2008 [Separation] [A]greement."[35] And it found that "the evidence conclusively established the award of: $1,582,167.00 in response to Question No. 2, subpart 1 (Ginn's restricted stock that vested on March 30, 2008)."

As noted above, the record establishes that NCI, pursuant to the terms of the Separation Agreement, agreed to pay Ginn his salary of $359,342 from March 31, 2008 through March 31, 2009 and vest, on March 30, 2008, "[a]ll Restricted Stock Awards granted to Ginn prior to December 31, 2007." NCI's damages expert, Van Uden, testified that 67,326 shares of stock vested on March 30, 2008 "as a result of [Ginn] entering into" the Separation Agreement. And on March 30, 2008, the price of the stock per share was $23.51, making the gross value of Ginn's vested stock $1,582,840. Van Uden then explained that because Ginn was required to pay

---

[35]     In its judgment, the trial court noted that"[i]n subpart 1 to question nos. 2, 5, 9, and 11," the jury found "zero dollars" as "[t]he value of Kelly Ginn's restricted stock that was allowed to vest on March 30, 2008."

one cent for each share he was awarded, the "net value of the shares that were vested to Mr. Ginn as part of th[e] [S]eparation [A]greement" was $1,582,167.

Ginn and his damages expert, Solomon, agreed with Van Uden's calculations. Ginn testified that at the time he left NCI, he had 67,326 shares of non-vested stock, which had a price of $23.51 per share and a total gross value of $1,582,840. He explained that he had to pay "a penny a share," so Ginn's "net gain" from the shares of stock that vested pursuant to the Separation Agreement was $1,582,167. Thus, including his salary, "the total compensation [that he] received was valued at $1,941,509." Solomon likewise testified that "$1,941,509 is the amount of money and benefits [NCI] gave Kelly Ginn at the time he signed th[e] [Separation] [A]greement," with $1,582,167 attributed to "Ginn's net gain from [the previously] non-vested [stock] shares."

Thus, we conclude that the evidence at trial conclusively established $1,582,167 as the value of restricted stock that was allowed to vest on March 30, 2008 and the amount of damages awarded in the trial court's judgment on NCI's stock claim. Accordingly, we hold the trial court did not err in disregarding the jury's finding of zero dollars for damages regarding NCI's stock claim and entering its judgment notwithstanding the verdict.

We overrule Ginn's first issue.

**Terminated Without Cause**

In his second issue, Ginn argues that the trial court erred in not disregarding the jury's finding that he "had not proved that h[is employment] was terminated without cause" because the "evidence conclusively established that [he] was terminated from his position at NCI without cause."

Ginn argues that because "[t]he only document that says 'Ginn agrees to and hereby resigns' is the [Separation] Agreement," and "the trial court rescinded that [a]greement," it cannot be considered as evidence that NCI did not terminate his employment without cause. He asserts that "the other evidence [presented at trial] conclusively established that [he] was terminated from his position at NCI without cause."

However, the record contains evidence to the contrary. For instance, Chambers, NCI's chairman, CEO, and president, testified that he never told Ginn that he was "fired," his employment would be "terminated," or that he "had looked around and there was not another position for [Ginn] in the company." And it was not Chambers' intention "for [Ginn] . . . to leave the company." Further, Chambers explained that Ginn's employment "wasn't [being] terminated," as a result of the March 14, 2008 meeting; rather, Chambers simply informed Ginn that "[h]e just wasn't going to get the promotion." In fact, Chambers had even "given

some thought to a possible other position for [Ginn]," since "he wasn't going to get the [COO] promotion."

Chambers also testified that a few days after the March 14, 2008 meeting, Ginn telephoned Chambers and "confirmed" that "he wanted to resign" from NCI, and he "asked [about the] kind of [separation] package" that he would receive. At that point, "it was absolutely clear [to Chambers that Ginn] had decided he was going to leave the company." Chambers, however, never instructed Ginn to say that he had "resigned" from NCI.

Similarly, Dobbins, NCI's COO, testified that Ginn "resigned" from NCI. After Chambers and Ginn's March 14, 2008 meeting, Dobbins met with Ginn "to transition the things that [Ginn] was working on" in order to prepare for his departure. During their meeting, and in regard to the topic of Ginn "leaving the company," Ginn told Dobbins, "This is all on me." Dobbins understood this statement as Ginn "letting [him] know that [he] shouldn't feel bad about [Ginn's] departure."

Dobbins further explained that, during their meeting, Ginn did not tell him that his employment had been terminated or he had been "fired" from NCI, and Ginn did not say anything in Dobbins' presence that was inconsistent with him having resigned. According to Dobbins, when NCI terminates an individual's employment, it "immediately restrict[s] [his] access to [the] IT systems," and the

individual has a "quick departure from the company." However, in Ginn's situation, his access to company files was not restricted, and he continued working after his March 14, 2008 meeting with Chambers.

Further, Moore, NCI's general counsel, testified that Ginn "resigned" from his position at NCI. And Moore explained that when an NCI employee is actually "fired" from the company, he is not "given two more weeks of access to [the company's] confidential documents," as was Ginn. And if Ginn had been "fired" or his employment "terminated" in his March 14, 2008 meeting with Chambers, he would not "have been allowed to continue to work with the company and have access to" company materials. Finally, according to Moore, it is not NCI's policy to enter into separation agreements, like the one it entered into with Ginn, when it terminates an individual's employment.

The evidence does not conclusively establish that NCI terminated Ginn's employment without cause, even without considering the language of the Separation Agreement. Accordingly, we hold that the trial court did not err in denying Ginn's request that it disregard the jury's finding that Ginn did not prove by a preponderance of evidence that NCI terminated his employment without cause.

We overrule Ginn's second issue.

## Attorney's Fees under Section 15.51(c)

In his twelfth issue, Ginn argues that the trial court erred in concluding that he was not entitled to his attorney's fees because "he proved the predicate findings for such an award as a matter of law and the trial court's factual findings are against the great weight and preponderance of the evidence." *See* TEX. BUS. & COM. CODE ANN. § 15.51(c). Alternatively, Ginn asserts that the trial court erred in not submitting "to the jury the predicate fact[] [findings] necessary to prove up his entitlement to attorney's fees under section 15.51(c)."

In a lawsuit to enforce a covenant not to compete, section 15.51(c) provides for the award of attorney's fees to an employee in limited circumstances:

> If the primary purpose of the agreement to which the covenant is ancillary is to obligate the [employee] to render personal services, the [employee] establishes that the [employer] knew at the time of the execution of the agreement that the covenant did not contain limitations as to time, geographical area, and scope of activity to be restrained that were reasonable and the limitations imposed a greater restraint than necessary to protect the goodwill or other business interest of the [employer], and the [employer] sought to enforce the covenant to a greater extent than was necessary to protect the goodwill or other business interest of the [employer], the court *may award* the [employee] the costs, including *reasonable attorney's fees*, actually and reasonably incurred by the [employee] in defending the action to enforce the covenant.

TEX. BUS. & COM. CODE ANN. § 15.51(c) (emphasis added). Because the statute provides that the trial court "may award" attorney's fees, such an award falls within the trial court's discretion and is not mandatory. *Sentinel Integrity*

86

*Solutions, Inc. v. Mistras Grp., Inc.*, 414 S.W.3d 911, 924 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); *see also Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998) (holding statutes providing court "'may' award" permissive and abuse of discretion required to overturn order granting or denying award). Thus, Ginn must, to prevail on appeal, establish that the trial court abused its discretion in denying his attorney's fees. *See Spring v. Walthall, Sachse & Pipes, Inc.*, No. 04-09-00474-CV, 2010 WL 2102988, at *11–12 (Tex. App.—San Antonio May 26, 2010, no pet.) (mem. op.) ("The party claiming abuse of discretion has the burden on appeal to show . . . the trial court abused its discretion in denying [him] attorney's fees.").

To obtain an award of attorney's fees under section 15.51(c), Ginn had to prove that (1) NCI knew at the time it executed the Separation Agreement that the covenant not to compete did not contain reasonable limitations as to the time, geographical area, and scope of activity to be restrained and the limitations imposed a greater restraint than necessary to protect NCI's goodwill or other business interest, and (2) NCI sought to enforce the covenant to a greater extent than was necessary to protect its goodwill or other business interest. *See* TEX. BUS. & COM. CODE ANN. § 15.51(c); *Sentinel*, 414 S.W.3d at 924. Ginn did not, however, request that the trial court submit to the jury questions regarding whether NCI knew, at the time it executed the Separation Agreement, that the limitations in

the covenant not to compete were unreasonable and whether NCI sought to enforce the agreement to a greater extent than necessary to protect its goodwill or other business interest. *See Sentinel*, 414 S.W.3d at 918–19, 925 (noting jury charge contained question asking "whether '[employer] (1) [knew] at the time the Employment Agreement was signed that the covenant not to compete did not contain limitations as to time, geographical area, or scope of activity to be restrained that were reasonable and (2) [sought] to enforce the limitations to a greater extent than necessary to protect [its] business interest'" and jury found employer "knew at the time the employment agreement was signed that the covenant not to compete contained [unreasonable] limitations . . . and that it sought to enforce the limitations to a greater extent than necessary" (second and third alterations in original)); *see also Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 678 (S.D. Tex. 2010) (analyzing counterclaim for attorney's fees under section 15.51(c) and noting issue of employer's knowledge of unenforceability constitutes fact issue).

Generally, a failure to submit or request a jury question on a ground of recovery or defense results in waiver of that ground on appeal. *See* TEX. R. CIV. P. 279. However, if a fact is "conclusively established," then a jury finding is not required. *Id.* (independent grounds of recovery not waived if "conclusively established"); *see also T. A. Manning & Sons, Inc. v. Ken–Tex Oil Corp.*, 418

88

S.W.2d 324, 326 (Tex. Civ. App.—Austin 1967, writ ref'd n.r.e.) (jury questions "should not be submitted where the facts in question are conclusively established").

Although Ginn, in his brief, asserts that "he proved the predicate findings" for an attorney's fees award as a matter of law, he provides no argument or citations to authority or the record that demonstrate that NCI sought to enforce the covenant not to compete to a greater extent than was necessary to protect its goodwill or other business interest.[36] *See* TEX. BUS. & COM. CODE ANN. § 15.51(c); *Sentinel*, 414 S.W.3d at 924. Accordingly, we conclude that this issue is inadequately briefed and, thus, waived. *See* TEX. R. APP. P. 38.1(i); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (discussing long-standing rule that inadequate briefing waives issue on appeal).

We note that Ginn alternatively asserts that the trial court "den[ied] [him] his constitutional right to a jury trial" by refusing to "submit to the jury the predicate facts necessary to prove up his entitlement to attorney's fees under section 15.51(c)." And he requests that we "remand [his] attorney's fees claim for a jury

---

[36] Ginn further asserts that the trial court's findings of fact and conclusions of law regarding his entitlement to attorney's fees under the Act alleviate the need for factual findings from the jury. However, findings of fact and conclusions of law are not generally available after a jury trial, and in this case, the trial court erred in entering its findings and conclusions on factual questions that should have been submitted to the jury. *See Roberts v. Roberts*, 999 S.W.2d 424, 433 (Tex. App.—El Paso 1999, no pet.); *see also* TEX. R. CIV. P. 296 (allowing findings and conclusions in cases tried to court).

89

trial on the predicate factual issues." However, Ginn did not submit to the trial court a jury question, in writing and using substantially correct wording, related to his claim for attorney's fees. Thus, he cannot complain on appeal that the trial court erred in not submitting such a question or instruction to the jury on his claim for attorney's fees. *See* TEX. R. CIV. P. 278 ("Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment . . . ."); *Gonzalez v. Latino Learning Ctr., Inc.*, 01-91-00333-CV, 1996 WL 303480, at *3 (Tex. App.—Houston [1st Dist.] June 6, 1996, no writ) (not designated for publication) ("If a party does not submit a requested instruction or definition in writing, he waives any error by the trial court in not submitting the requested material.").

We overrule Ginn's twelfth issue.[37]

---

[37] Given our disposition of the preceding issues, it is unnecessary for the Court to address Ginn's tenth, eleventh, and thirteenth issues, in which he contends that "[t]he trial court erred in submitting NCI's breach of fiduciary duty/misappropriation claim twice," "this Court should remand [this case] for a new determination of whether NCI is entitled to any prejudgment interest," and "[t]he trial court erred in submitting NCI's claims in the jury charge." *See* TEX. R. APP. P. 47.1.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings and Higley.[38]

---

[38] This case was originally set for submission with oral argument on January 28, 2014 to a panel consisting of Chief Justice Radack and Justices Massengale and Huddle. However, the case was reassigned and then reset for submission with oral argument to the current panel.

The Honorable Jim Sharp, former Justice of this Court, was a member of the Panel and present for argument when this case was actually submitted. Because his term expired on December 31, 2014, he did not participate in the decision of the case. *See* TEX. R. APP. P. 41.1(b) ("After argument, if for any reason a member of the panel cannot participate in deciding a case, the case may be decided by the two remaining justices.").